[No. F059382. Fifth Dist. June 21, 2011.]

CHAWANAKEE UNIFIED SCHOOL DISTRICT, Plaintiff and Appellant, v. COUNTY OF MADERA et al., Defendants and Respondents; RIO MESA HOLDINGS, LLC, et al., Real Parties in Interest and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part IV. of the Discussion, and the Disposition are certified for publication.

## COUNSEL

Barth & Tozer and Thomas W. Barth for Plaintiff and Appellant.

David A. Prentice and Douglas W. Nelson for Defendants and Respondents.

Sanger & Olson, John M. Sanger and Charles R. Olson for Real Parties in Interest and Respondents.

## OPINION

**DAWSON, Acting P. J.—**

### INTRODUCTION

Chawanakee Unified School District (School District) filed a petition for writ of mandate challenging the County of Madera's (County) approval of a development project on the grounds that the project's environmental impact report (EIR) failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] and that the project's specific plan failed to meet the consistency requirement of California's Planning and Zoning Law (Gov. Code, § 65000 et seq.). The trial court denied the petition. School District appealed.

In the published portion of this opinion, we address (1) the meaning of a statutory provision that states capped development fees and certain other provisions "shall be the exclusive methods of considering and mitigating

---

[1] Further statutory references are to the Public Resources Code unless otherwise indicated.

impacts on school facilities that occur or might occur as a result" of approval of the development of land (Gov. Code, § 65996, subd. (a)) and (2) the effect of this provision on the contents of an EIR. Because these issues of statutory construction are pure questions of law, however, the facts and proceedings in this case are not published.

In the unpublished portion of this opinion, we conclude the CEQA claim has merit. The EIR inadequately analyzes the project's potential environmental impacts during the period when students from the new development would attend existing offsite schools (i.e., before schools are built within the project area to accommodate those students), which impacts include (1) increases in traffic near and on the way to existing schools and (2) environmental impacts from the construction of additional facilities at existing schools.

We also conclude that School District failed to demonstrate that the project's specific plan violated the Planning and Zoning Law by being inconsistent with County's general plan.

The judgment will be reversed and the matter remanded for issuance of a writ of mandate.

## FACTS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## PROCEEDINGS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

I.–III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. *Senate Bill No. 50*

One of the parties' disputes over the adequacy of the EIR's analysis of environmental impacts arises from a disagreement over the meaning of certain provisions contained in the Leroy F. Greene School Facilities Act

---

*See footnote, *ante*, page 1016.

of 1998 (Stats. 1998, ch. 407, p. 2989; Ed. Code, § 17070.10 et seq.), Senate Bill No. 50 (1997–1998 Reg. Sess.), which sometimes is referred to as Senate Bill 50. Among these provisions is a restriction on the "methods of considering and mitigating impacts on school facilities" caused by a development project. (Gov. Code, § 65996, subd. (a).) The parties dispute how this restriction affects the EIR, particularly its discussion of environmental impacts involving students who will live in the project's residential development.

## A. *Background*

During the first decade after CEQA's enactment, questions arose concerning CEQA's application to development projects that caused an increase in student enrollment and overcrowding in schools. For example, in *El Dorado Union High School Dist. v. City of Placerville* (1983) 144 Cal.App.3d 123 [192 Cal.Rptr. 480], the appellate court addressed an issue of first impression concerning "whether the impact of increased student enrollment is cognizable under [CEQA]." (*Id.* at p. 126.) The court determined that, in the circumstances of that case, such an impact was within the purview of CEQA. (144 Cal.App.3d at p. 126.) The circumstances mentioned by the court included "ample evidence of present overcrowding, projections of gradually increasing high school enrollment, and the necessity for construction of at least one new high school . . . ." (*Id.* at p. 131.) The court also determined that the EIR for the 552-unit residential development was inadequate because it contained no discussion of the project's impacts on schools and merely stated no mitigation measures were required. (*Id.* at p. 132.)

After California's judiciary established the principle that CEQA's mitigation measures applied to the impacts on schools caused when a residential development project leads to increased student enrollment, the Legislature addressed the topic of impacts on schools. In 1986, it enacted a complex statutory scheme to govern the imposition of school facilities fees on those seeking the governmental approvals needed to develop real estate. (*Corona-Norco Unified Sch. Dist. v. City of Corona* (1993) 13 Cal.App.4th 1577, 1582 [17 Cal.Rptr.2d 236] (*Corona-Norco*).) The school facilities legislation (1) allowed school districts to levy a charge against new developments to fund construction of school facilities but capped the amount that could be charged and (2) limited the types of mitigation requirements local government could impose against a development project to alleviate the project's impacts on school facilities. (*Id.* at pp. 1582–1583.) Stated generally, the capped school facilities fees became the sole measure for mitigating the impacts of increased enrollment.

The school facilities legislation and its relationship to CEQA were discussed by the court in *Corona-Norco, supra,* 13 Cal.App.4th 1577. In that case, the school district filed petitions for writ of mandate to compel the city to rescind approvals of tentative tract maps for two residential developments. (*Id.* at p. 1580.) The school district's legal theories included claims that the EIR failed to describe the adverse environmental impact of the proposed projects on local school facilities and services, failed to describe feasible mitigation measures, and failed to incorporate mitigation measures into the conditions for project approvals. (*Id.* at p. 1581.) The petitions supported these claims by alleging the school district's facilities were seriously overcrowded, the proposed developments would exacerbate the overcrowding, and the statutorily authorized fee was insufficient to fund the construction of facilities needed to relieve the overcrowding. (*Ibid.*)

The trial court sustained a demurrer to the school district's petitions and the school district appealed. (*Corona-Norco, supra,* 13 Cal.App.4th at p. 1580.) The Court of Appeal affirmed, stating: "The gravamen of the District's CEQA claims is that the City had a duty, in conducting CEQA review, to impose conditions in addition to the [statutorily authorized] fee to lessen the alleged impacts of the development projects on local school facilities. This position must fail [because] the District's position does not acknowledge the strict limitations on local agencies' powers in [Government Code] sections 65995 and 65996." (*Id.* at p. 1587.)

The Court of Appeal refused to return the case for further CEQA analysis because, under the school facilities legislation, "the trial court could not require the City to impose additional mitigation conditions, nor could it require the City to set aside the project on the basis of inadequate mitigation, even if CEQA violations were found." (*Corona-Norco, supra,* 13 Cal.App.4th at p. 1587.)[3]

The next historical development leading to the enactment of Senate Bill 50 occurred when the Courts of Appeal issued decisions that narrowed the application of the limits on mitigation contained in the school facilities legislation and thereby expanded the reach of CEQA. Those decisions

---

[3] We note that the court in *Corona-Norco* was considering the former version of Government Code section 65996, subdivision (a), which referred to "the exclusive methods of mitigating environmental effects *related to* the adequacy of school facilities when considering the approval or the establishment of conditions for the approval of a development project" (italics added) (Stats. 1992, ch. 1354, § 6, p. 6769) and the fact that courts usually construe broadly the term "related to." (E.g., *CPF Agency Corp. v. Sevel's 24 Hour Towing Service* (2005) 132 Cal.App.4th 1034, 1044 [34 Cal.Rptr.3d 120] ["related to" in federal preemption provision is interpreted quite broadly].)

concluded the legislation applied only to adjudicative decisions of local government, such as the issuance of building permits. (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2011) § 14.28, p. 716.) Under this narrow view, developers that were requesting legislative actions, such as approvals of general plan amendments, specific plans or rezoning, were not protected by the provision that limited mitigation measures to the capped school facilities fee. (E.g., *Mira Development Corp. v. City of San Diego* (1988) 205 Cal.App.3d 1201, 1218 [252 Cal.Rptr. 825] (*Mira*) [restrictions in Gov. Code, § 65996 did not apply to zoning decision].)

For example, in *Murrieta Valley Unified School Dist. v. County of Riverside* (1991) 228 Cal.App.3d 1212 [279 Cal.Rptr. 421], the court considered a county's argument that (1) the capped school facilities fee was the only measure it could impose to mitigate the impact of future development on the school facilities, (2) the school facilities legislation preempted the field of school facilities financing which precluded it from imposing fees in excess of the capped school facilities fee, and (3) it could not impose other nonfee mitigation measures to ameliorate the adverse effects of development on school facilities. (*Id.* at p. 1229.) The court disagreed with the third part of this argument and concluded that the county had the authority to consider and provide for mitigation measures to address the general plan amendment's contribution to student overcrowding and adverse impacts on inadequate school facilities within the plan area. (*Id.* at p. 1234.) The mitigation measures that the court regarded as permissible included reducing the density of residential development and imposing controlled phasing of residential development in areas of the school district with inadequate school facilities. (*Ibid.*)

The Legislature reacted to the judicial decisions that narrowed application of the limits on fees and mitigation (i.e., expanded the application of CEQA) by enacting Senate Bill 50. The following provides an overview of the school facilities legislation after the enactment of Senate Bill 50: "SB 50 employs three primary means to preempt the field of development fees and mitigation measures related to school facilities and to overturn [*Mira* and its progeny]. First, it provides for a *cap on the amount of fees, charges, dedications or other requirements* which can be levied against new construction to fund construction or reconstruction of school facilities. Second, SB 50 *removes denial authority* from local agencies by prohibiting refusals to approve legislative or adjudicative acts based on a developer's refusal to provide school facilities mitigation exceeding the capped fee amounts, or based on the inadequacy of school facilities. Third, it *limits mitigation measures* which can

be required, under the California Environmental Quality Act or otherwise, to payment of the statutorily capped fee amounts and deems payment of these amounts to provide full and complete school facilities mitigation[.]' " (9 Miller & Starr, Cal. Real Estate (3d ed. 2007) § 25:49, pp. 25-213 to 25-214, fns. omitted.)

### B. *Statutory Text*

#### 1. *Government Code section 65996, subdivision (a)*

The version of Government Code section 65996, subdivision (a) in effect prior to the enactment of Senate Bill 50 listed certain statutory provisions as "the exclusive methods of mitigating environmental effects related to the adequacy of school facilities when considering the approval or the establishment of conditions for the approval of a development project . . . ." (Stats. 1992, ch. 1354, § 6, p. 6769.)

Senate Bill 50 changed subdivision (a) of Government Code section 65996 to provide that, notwithstanding CEQA or any other provision of law, Education Code section 17620[4] and certain provisions for interim urgency measures "shall be the exclusive methods of considering and mitigating impacts on school facilities that occur or might occur as a result of any legislative or adjudicative act . . . involving [the approval of the] development of real property . . . ." The Legislative Counsel's Digest described this change as follows:

"(7) Existing law sets forth the exclusive methods of mitigating environmental effects related to the adequacy of school facilities when considering the approval or establishment of conditions for the approval of a development project under [CEQA].

"This bill would, notwithstanding any other provision of law, instead, set forth exclusive methods of considering and mitigating impacts on school facilities which occur or might occur as a result of any legislative or adjudicative act by any state or local agency involving, but not limited to, the planning, use, or development of real property or any change of governmental organization or reorganization." (Legis. Counsel's Dig., Sen. Bill No. 50 (1997–1998 Reg. Sess.) 6 Stats. 1998, Summary Dig., p. 175.)

---

[4] Education Code section 17620 authorizes the governing board of any school district to levy a charge against any construction within the boundaries of the district for the purpose of funding construction or reconstruction of school facilities, subject to the limits "set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7 of the Government Code." (*Id.*, subd. (a)(1).) The limits include a cap on the school impact fee imposed on residential construction ($1.93 per square foot) and commercial construction ($0.31 per square foot). (Gov. Code, § 65995, subd. (b)(1), (2).) The caps are adjusted every two years for inflation. (*Id.*, subd. (b)(3).)

2. *Other provisions*

Beside subdivision (a) and its reference to "the exclusive methods of considering and mitigating impacts on school facilities," other provisions in Government Code section 65996 mention mitigation and define the term "school facilities":

"(b) The provisions of this chapter are hereby deemed to provide full and complete school facilities mitigation and, notwithstanding [Government Code] Section 65858, or [CEQA], or any other provision of state or local law, a state or local agency may not deny or refuse to approve [the] development of real property . . . on the basis that school facilities are inadequate.

"(c) For purposes of this section, 'school facilities' means any school-related consideration relating to a school district's ability to accommodate enrollment. [¶] . . . [¶]

"(e) Nothing in this section shall be interpreted to limit or prohibit the ability of a local agency to mitigate the impacts of land use approvals other than on the need for school facilities, as defined in this section." (Gov. Code, § 65996.)

The Legislature's findings and declaration of policy regarding financing school facilities and mitigation of development impacts on those facilities are addressed in Government Code section 65995, subdivision (e): "[T]he financing of school facilities and the mitigation of the impacts of land use approvals . . . on the need for school facilities are matters of statewide concern. For this reason, the Legislature hereby occupies the subject matter of requirements related to school facilities levied or imposed in connection with, or made a condition of, any land use approval, . . . and the mitigation of the impacts of land use approvals . . . on the need for school facilities, to the exclusion of all other measures, financial or nonfinancial, on the subjects. For purposes of this subdivision, 'school facilities' means any school-related consideration relating to a school district's ability to accommodate enrollment."

Subdivision (h) of Government Code section 65995 provides that payment of the statutory fee is "deemed to be full and complete mitigation of the impacts of any legislative or adjudicative act, or both, involving [the] development of real property . . . on the provision of adequate school facilities." Furthermore, a public agency may not refuse to approve the development of real property based on the developer's refusal to provide

school facilities mitigation that exceeds the amount authorized by statute. (Gov. Code, § 65995, subd. (i).)

### C. Contentions of the Parties

School District contends that "SB 50 does not eliminate the requirement under CEQA for full disclosure of significant environmental effects of development on school services." School District argues that Government Code section 65996 "contemplates that the decision-maker on land use approvals has the advantage of a full analysis and disclosure of school-related environmental effects of a project, in order to consider alternative mitigation measures."

In contrast, County and real parties in interest contend that Senate Bill 50 strictly limits consideration, as well as mitigation, of school-related impacts. They argue that the addition of the words "considering and" in Government Code section 65996, subdivision (a) expands the statute beyond mitigation to include identification, analysis and evaluation. They also argue the change from "environmental effects related to the adequacy of school facilities" to "impacts on school facilities" expanded the scope of the prohibition to include any impacts on a school district's ability to accommodate enrollment (i.e., overcrowding, interim facilities, permanent facilities and all other physical and financial aspects).

### D. Analysis

██ A reviewing court's "fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) This task begins by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) Courts sometimes obtain the ordinary meaning of words by referring to a dictionary. (*Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 294 [41 Cal.Rptr.3d 420] [dictionary definitions used by this court in interpreting CEQA guidelines]; *Leavitt v. County of Madera* (2004) 123 Cal.App.4th 1502, 1514 [22 Cal.Rptr.3d 101] [dictionary definitions used to interpret CEQA provisions].)

The language in Government Code section 65996, subdivision (a) at issue in this case includes four changes enacted by Senate Bill 50. First, the former provision's phrase "exclusive methods of mitigating" was expanded to "exclusive methods of considering and mitigating." Second, the term "environmental effects" was replaced with "impacts." Third, the term "related to" was

changed to "on." Fourth, the phrase "the adequacy of school facilities" was shortened to "school facilities." As a result of these changes, Government Code section 65996, subdivision (a) now refers to "the exclusive methods of considering and mitigating impacts on school facilities . . . ."

The parties dispute the meaning of Senate Bill 50's addition of the word "considering" to the statute. No published case has addressed the meaning of this change, but one practice guide has stated: "In the authors' view, because the statute states that the statutory fees are the exclusive means of considering as well as mitigating school impacts, it limits not only the mitigation that may be required, but also the scope of impact review in the EIR and the findings for school impacts." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 14.28, p. 717.)

The authors appear to believe the word "considering" encompasses (1) setting forth information in the EIR, (2) evaluating the information, and (3) using it to reach a decision about certifying the EIR and approving the project. (CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.; CEQA Guidelines), § 15090, subd. (a)(2) [lead agency shall certify "that the decisionmaking body reviewed and *considered* the information contained in the final EIR prior to approving the project" (italics added)].)

The dictionary definition of the word "consider" has been set forth in a published decision of the Court of Appeal: "*Consider* is 'to view attentively . . . to fix the mind on, with a view to careful examination; to think on with care; to ponder; to study; to meditate on . . . .' " (*Gonzales v. Interinsurance Exchange* (1978) 84 Cal.App.3d 58, 63 [148 Cal.Rptr. 282].) Under this definition, evidence is "considered" if it is weighed by the court. (*Ibid.*)

When this dictionary definition is plugged into the statute in place of the word "considering," Government Code section 65996, subdivision (a) provides that the capped statutory fee and certain interim urgency measures "shall be the exclusive methods of [viewing attentively, examining carefully, studying] and mitigating impacts on school facilities . . . ."

Setting forth a description and analysis of impacts on school facilities in the EIR would be another method of examining and studying those impacts. Because the methods set forth in Government Code section 65996, subdivision (a) are exclusive, that provision obviates the need for an EIR to contain a description and analysis of a development's impacts on school facilities. Based on this interpretation, we reject School District's claim that the EIR violates CEQA because it lacks any analysis of the environmental

consequences for the existing school facilities that will be forced to accommodate hundreds of students beyond current overcrowded conditions.

■ Senate Bill 50's substitution of "impacts" for "environmental effects" is not a change that is critical in this case. The terms "impacts" and "effects" are synonymous. (CEQA Guidelines, § 15358.)

■ Senate Bill 50's substitution of "on" for "related to" indicates a narrowing of the statute. The term "on" has numerous definitions, including being "used as a function word to indicate position over and in contact with that which supports from beneath" and being "used as a function word to indicate the object of action or motion . . . ." (Webster's 3d New Internat. Dict. (1986) pp. 1574, 1575.) In contrast, the term "related to" generally is interpreted broadly by courts. (E.g., *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 873 [21 Cal.Rptr.2d 691, 855 P.2d 1263] [term "related" is broad and commonly understood to encompass both logical and causal connections]; *CPF Agency Corp. v. Sevel's 24 Hour Towing Service, supra,* 132 Cal.App.4th at p. 1044 ["related to" in federal preemption provision is interpreted quite broadly].) Use of the term "related to" with "environmental effect" appears to include both direct effects on the school facilities and indirect effects on parts of the environment other than the school facilities. The CEQA Guidelines' definition of "effect" uses the term "related to" in its expansive description of indirect or secondary effects. (CEQA Guidelines, § 15358, subd. (a)(2).) In contrast to the breadth of "related to," the use of the term "on" indicates a direct relationship between the object (i.e., school facilities) and the impact and excludes impacts to other parts of the physical environment.

■ Consequently, the phrase "impacts on school facilities" used in Senate Bill 50 does not cover all possible environmental impacts that have any type of connection or relationship to schools. As a matter of statutory interpretation, we conclude that the prepositional phrase "on school facilities" limits the type of impacts that are excused from discussion or mitigation to the adverse physical changes to the school grounds and school buildings, and "any school-related consideration relating to a school district's ability to accommodate enrollment." (Gov. Code, § 65996, subd. (c).) Therefore, the project's indirect impacts on parts of the physical environment that are not school facilities are not excused from being considered and mitigated.

Applying this statutory construction leads us to conclude that an impact on traffic, even if that traffic is near a school facility and related to getting students to and from the facility, is not an impact "on school facilities"

for purposes of Government Code section 65996, subdivision (a). From both a chronological and a molecular view of adverse physical change, the additional students traveling to existing schools will impact the roadways and traffic before they set foot on the school grounds. From a funding perspective, the capped school facilities fee will not be used by a school district to improve intersections affected by the traffic. Thus, it makes little sense to say that the impact on traffic is fully mitigated by the payment of the fee. ■   In summary, we conclude the impact on traffic is not an impact on school facilities and, as a result, the impact on traffic must be considered in the EIR.

■   The question about the construction of additional school facilities (either temporary or permanent) at an existing site is not as clear cut as the traffic issue because of the causal connection between the overcrowding created by the project's students and the construction to alleviate the over-crowding. We conclude, however, the reasonably foreseeable impacts of that construction on the nonschool physical environment are not "impacts on school facilities" and are not excluded from consideration in the EIR. For illustrative purposes only, the impacts on the nonschool physical environment that might result from the construction include dust that degrades air quality and noise caused by the construction activity. These types of impacts to the nonschool physical environment are caused *indirectly* by the project and should be considered in the EIR. (See CEQA Guidelines, § 15358, subd. (a)(2) [indirect effects caused by the project].)

V.–VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with directions to vacate its order denying the petition for writ of mandate and to enter a new order that grants the petition for writ of mandate and compels County to (1) set aside the certification of the final EIR, (2) set aside the approvals of the project, and (3) take the action necessary to bring the EIR into compliance with CEQA regarding its analysis of (a) traffic from private and schoolbus trips to existing schools outside the project area pending the construction of schools within the project area and (b) the potential environmental effects from any construction of additions, either temporary or permanent, to existing schools prior to the construction of schools in the project area.

*See footnote, *ante*, page 1016.

The superior court shall retain jurisdiction over the proceedings by way of a return to the writ.

Costs on appeal are awarded to plaintiff.

Kane, J., and Vortmann, J.,[*] concurred.

A petition for a rehearing was denied July 19, 2011, and the opinion was modified to read as printed above. The petition of defendants and respondents for review by the Supreme Court was denied September 14, 2011, S195032.

---

[*]Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.