Filed 9/7/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SANTA RITA UNION SCHOOL DISTRICT et al., <br><br>    Plaintiffs and Respondents, <br><br>v. <br><br>CITY OF SALINAS, <br><br>    Defendant; <br><br>REXFORD TITLE, INC., et al., <br><br><br>    Real Parties in Interest and Appellants. | H049854 <br>(Monterey County <br>Super. Ct. No. 20CV000242) <br><br><br>ORDER MODIFYING OPINION <br>AND DENYING REHEARING <br><br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on August 10, 2023, be modified as follows:

1.    On page 7, starting on line 11, the phrase beginning with "citing section" and ending on line 12 with "section 15186," is deleted so the sentence reads:

The EIR also noted that future site-specific environmental review would be required for each new school from the responsible school

1

district as lead agency before approval of as yet unknown designs for each facility.

There is no change in judgment.

Respondent's petition for rehearing is denied.

_____

WILLIAMS, J.*

WE CONCUR:

_____

DANNER, ACTING P.J.

_____

WILSON, J.

*Santa Rita Union School District, et al., v. City of Salinas, et al.*
H049854

---

Filed 8/10/23 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SANTA RITA UNION SCHOOL DISTRICT et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF SALINAS, <br><br> Defendant; <br><br> REXFORD TITLE, INC., et al., <br><br> Real Parties in Interest and Appellants. | H049854 <br> (Monterey County <br> Super. Ct. No. 20CV000242) |

This appeal arises under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; further unspecified statutory references are to this code) and its implementing regulations (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)). At issue is whether the Final Environmental Impact Report (EIR) for the West Area Specific Plan (Specific Plan or Project), as certified by the City of Salinas as lead agency, was inadequate. The Draft EIR did not discuss or analyze any potential off-site impacts flowing from an assumption that the construction of new schools as contemplated by the Project would never be built. The Santa Rita Union School

District (SRUSD) and the Salinas Union High School District (SUHSD; collectively, the Districts) contended that they would never receive sufficient funding for these new facilities, and would therefore have to instead accommodate new students from residential development resulting from the Specific Plan at existing school sites or by other means. The Project identified locations for new schools and the EIR addressed anticipated off-site impacts of development at those sites. The City also imposed developer impact fees for the Project as set by the Districts under Education Code section 17620 and capped under Government Code sections 65995 and 65996, deemed full and complete mitigation under CEQA for adverse impacts of a project on local school facilities.

Leading up to the approval of the Specific Plan by the City and its certification of the Final EIR, the Districts objected to the EIR's adequacy. They contended that because of present insufficient school-facilities funding sources—a scenario they assumed would persist over the 20-30 year expected build-out of the Specific Plan—the new schools contemplated by the Project to accommodate increased enrollment would likely never be built, and that discussion in the Final EIR of indirect, off-site environmental impacts related to the Districts alternatively accommodating new students by other means was required under CEQA.

The City responded to the Districts' concerns by explaining that the purpose for its having identified sites for new schools within the Project site was to ensure there was adequate land set aside for the development of new schools, and that the EIR had sufficiently analyzed potentially significant and reasonably foreseeable impacts related to new-school construction, as contemplated by the Project. At bottom, the City maintained that the information relayed by the Districts—all premised on the assumption that

2

sufficient funding to build new schools as contemplated by the Specific Plan would not become available over the next 20-30 years—amounted to no more than speculation and uncertainty not requiring further environmental review or response. The City further posited that no meaningful review or analysis of suggested indirect and off-site impacts from the Districts alternatively accommodating new students at existing sites or in other ways could be conducted in any event based on the type of vague, uncertain, and generalized information on alternatives the Districts had provided. The City also responded that, for various specified other reasons, CEQA did not require further review or analysis of potential impacts from the Districts' suggested alternatives for accommodating increased enrollment.

After the City approved the Project and certified the Final EIR, the Districts petitioned the trial court for relief in mandate, raising the same challenges to the adequacy of the Final EIR as were asserted in their prior letters and public comments. The trial court, applying independent review, determined that the Final EIR was insufficient because it "failed to include discussion of potential off-site environmental impacts resulting from the [Specific Plan] due to [the Districts'] presented concerns that [they] will lack funding to build the proposed new school sites identified." The court further determined that the Final EIR "failed to adequately respond to comments made by [the Districts] with regard to potential off-site impacts." Thus, the court determined, the City had failed to proceed in the manner required by CEQA, and it granted narrow writ relief. The court did not set aside prior Project approvals, instead imposing severance under section 21168.9 and requiring the City to "prepare additional discussion of potential off-site environmental impacts" and to "provide more detailed responses to [the Districts'] comments"

3

about the "potential off-site impacts" before granting any further development entitlements within the Specific Plan.

The City chose to voluntarily comply with the trial court's judgment and writ in an attempt to cure the narrow defects in the Specific Plan EIR as identified by the trial court, and it did not appeal. But real parties in interest Rexford Title, Inc., et al.,[1] appealed from the judgment, defending the City's actions as compliant with CEQA as against potential claims for attorney fees based on the Districts having prevailed in the trial court.

We conclude that the Final EIR for the Specific Plan complied with CEQA with respect to the Districts' challenges. The EIR and its accompanying analysis of environmental impacts properly assumed that the contemplated new schools would be built as part of the Specific Plan and Project. Further, the City imposed developer impact fees as full and complete mitigation for impacts of the Project on school facilities. And it provided mitigation measures to the extent feasible for potentially significant off-site impacts related to the development of the new schools, recognizing that the Districts themselves would need to later address any project-specific impacts. The City was not required to analyze any potentially significant off-site impacts of ill-defined, uncertain, generalized, and speculative alternatives to new-school construction, as offered by the Districts.

---

[1] Real parties in interest are apparently landowner applicants for the Specific Plan approvals. They are not identified in briefing but they are, as far as we can tell, Rexford Title, Inc.; Patricia Jane Bondesen; Diane M. Vorwerck, as Trustee of The Diane M. Vorwerck Irrevocable Trust; Nancy Lyn Kelley, as Trustee of the Nancy Lyn Kelley Irrevocable Trust; Kaylene M. Mortensen, as Trustee of The G & K Mortensen Revocable Trust; Krista L. Vannest; Brian S. Mortensen; Marc D. Mortensen; Alvin C. Mortensen and Karen Rae Mortensen, as Trustees of the Mortensen Family Trust; Ray M. Harrod, Jr., dba Harrod Construction Company; RCS—Salinas Investment I, LLC; and Ann Aaroe, Individually and as Successor Trustee. We refer to these parties collectively as real parties.

These what-if alternatives were all premised on the mere assumption of insufficient funding over the next several decades that would preclude the new schools contemplated by the Specific Plan from ever being built. The Districts' expressed concerns about a perennial lack of sufficient school-facilities funding without providing more detailed information or identifying a more specific alternative plan to address this possibility—for which they, and not the City, would be responsible—amounted to no more than speculation and uncertainty. Therefore, no further environmental review or response from the City, beyond its existing responses to the Districts' comments and this conclusion of speculation as provided under Guidelines section 15145, was required in the Final EIR. We accordingly reverse.

STATEMENT OF THE CASE

I.     *Relevant Factual Background*

A. Project Overview

The City approved the Specific Plan, some 20 years in the making, in December 2019. It is based on the City's General Plan and covers an approximate 797-acre site (Site), which consists of 13 parcels in the northern portion of the City. The Specific Plan was prepared to establish the overall land-use concept and development framework for the Site. Contemplated development within the Specific Plan included 4,340 new residential dwelling units affordable to people of various income levels, with up to 15,928 residents at full build-out—some 20-30 years away—helping to meet a state goal of resolving the current housing-supply and affordability crisis. The provision of housing to accommodate Salinas's local critical need was likewise one of the principal objectives of the Specific Plan. In addition to housing, the Specific Plan included development within the Site of mixed-commercial uses, parks and

5

open space, and—as relevant here—schools, to address projected increases in student population resulting from the new residential housing units.

As noted in the Draft EIR, "the Specific Plan provides a very high level of design detail for certain components of the project. To the extent that sufficient detail is available in the Specific Plan, a full project-level analysis is provided in this EIR. Examples of a full project level analysis would include topics that are related to the physical acreage affected (i.e., the project footprint), as opposed to the number of units, land uses/zoning, or other design parameters. . . . Additionally, the Specific Plan includes a substantial level of detailed information that allows for a project-level analysis of topics such as Air Quality, Greenhouse Gases and Climate Change, Noise, Population and Housing, Transportation and Circulation, and Utilities. The analysis for these topics is driven by the number of units and square footage of development, which is detailed in the land use and design projections. In some cases, there may be specific commercial uses that have design details developed at a later date that cannot reasonably be analyzed at a project-level at this time. *Additionally, the design of school facilities and other public facilities are not known at this time, so they are not able to be analyzed at a project-level.* [¶] . . . Subsequent individual development that requires further discretionary approvals will be examined in light of this EIR to determine whether additional environmental documentation must be prepared." (Italics added.)

B. Schools Within the Specific Plan

At the outset, the Specific Plan included three elementary schools, one already operational, and one middle school, all located within the SRUSD, along with one high school, already planned and under construction, within the SUHSD. The Specific Plan notes that the "[r]esponsibility for development of public schools lies with the [Districts]" and that school facilities within the

6

Specific Plan are to be built "based on the projections of the need" in a phased approach as "determine[d] and control[led]" by the Districts.

While observing that Government Code sections 65995 and 65996 provide that school-related impacts are fully mitigated under CEQA through payment of developer-impact fees set by local school districts under Education Code section 17620, the EIR also concluded that anticipated construction of new schools within the Site would contribute to significant and unavoidable environmental impacts related to air quality, biological resources, greenhouse gases, noise, and transportation and traffic circulation. The EIR provided certain mitigation measures for these impacts based on the site footprints and using industry models. The EIR also noted, citing section 21151.8 and Guidelines section 15186, that future site-specific environmental review would be required for each new school from the responsible school district as lead agency before approval of as yet unknown designs for each facility. This review would consider any impacts or other circumstances not known when the City prepared the Specific Plan EIR, which it viewed in many respects as a program-level EIR[2] from which later projects could tier off when seeking approvals, and

[2] A " 'program EIR' evaluates the broad policy direction of a planning document, such as a general plan, but does not examine the potential site-specific impacts of the many individual projects that may be proposed in the future consistent with the plan. (§§ 21068.5, 21093; Guidelines, §§ 15168, 15385.)" (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1047 (*Treasure Island*).) But the same legal standards apply to all EIR's, and the question is not whether a particular project calls for a program or a project EIR. It is instead "whether the EIR addressed the environmental impacts of this [p]roject to a 'degree of specificity' consistent with the underlying activity being approved through the EIR. (Guidelines, § 15146; see § 15168, subd. (c)(5).)" (*Id*. at p. 1052.) In reviewing a challenge to an EIR, "it is unconstructive to ask whether the EIR provided 'project-level' as opposed to 'program-level' detail and analysis. Instead, we focus on whether the EIR provided 'decision makers with sufficient analysis to

that each school, if constructed, would be subject to the relevant mitigation measures in the Final EIR.

### C. Specific Plan EIR Process and the Districts' Public Comments

The CEQA Initial Study for the Specific Plan was circulated for public review and comment in October 2015. Of the identified five schools within the Site, by then one elementary school (McKinnon Elementary) was already operational and the high school (Rancho San Juan) had already been planned. The Initial Study noted potentially significant impacts for schools, and it represented that a "detailed analysis with adequate mitigation measures will be prepared in the EIR," including the "examination of public facilities impact fees."

In response to the Initial Study, SUHSD wrote a letter to the City in November 2015. The letter pointed out the lack of assurance that all students anticipated within the Specific Plan area could be served by the new high school, then projected to be open in the fall of 2018.

In January 2016, SRUSD likewise sent a comment letter to the City. This letter pointed out that student generation from the Specific Plan would fill two elementary schools and one middle school, but that the responsibility for constructing the schools would be borne by SRUSD alone and that "development fees are generally insufficient to cover all the costs associated with the necessary infrastructure around schools and other impacts to schools caused by the development, let alone construction[,] of additional schools themselves." The letter added that SRUSD did not have room for growth at its existing schools. And it emphasized that the payment of developer impact fees would not excuse the City from reviewing environmental impacts other than

intelligently consider the environmental consequences of [the] project.' [Citation.]" (*Ibid.*)

8

direct impacts on school facilities, and because the Project alone would cause these sorts of impacts, the City could not properly defer environmental analysis until after Specific Plan approval. The thrust of SRUSD's letter was focused not so much on environmental impacts but on its objection to the "lack of clear funding called for in the Specific Plan" and the need to "include additional mechanisms to ensure funding for construction of the three needed school facilities, necessary infrastructure around the schools, and other costs for school-related impacts caused by the project."

The City circulated the Specific Plan Draft EIR for public comment from February 17, 2019, to April 15, 2019. The document specifically addressed impacts related to the construction of new schools in Section 3.9 (Public Services). The Draft EIR noted that the Specific Plan was expected to generate between approximately 1,927 and 2,354 additional students for the Districts, with a maximum of 1,623 for the SRUSD, and that the Districts' existing schools were already at or near full capacity with shortages already being experienced at the elementary and middle school levels.[3] The new high school was expected to be at or near full capacity by the fall of 2019. The Draft EIR observed that besides the one new elementary school that had already been constructed and the new high school then under construction, the Specific Plan "may result in the need for the construction of [three] new schools, which has the potential to cause substantial adverse physical environmental impacts." And locations for the new schools were identified.

The general topics of environmental impacts addressed in the Draft EIR related to air quality (Section 3.1), biological resources (Section 3.2), cultural

---

[3] Based on information received from SRUSD on these projected enrollment numbers as being too low, the City adjusted its analysis in an Errata to incorporate the higher figures provided.

resources (Section 3.3), greenhouse gas emissions and climate change (Section 3.4), hazards and hazardous materials (Section 3.5), hydrology and water quality (Section 3.6), noise (Section 3.7), population (Section 3.8), public services (Section 3.9), transportation (Section 3.10), and utilities (Section 3.11). The Draft EIR adopted mitigation measures for all these categories. Along with addressing related impacts for new schools among these various categories of impacts, the specific mitigation measures included for public schools the implementation of a requirement for payment of development impact fees by the applicant of a residential building permit before a permit could be issued.

The Draft EIR further noted that such developer impact fees are considered as full and complete mitigation under CEQA for the construction of new schools, and that public schools within the Specific Plan "will be constructed based on projections of the need for these facilities" with the Districts determining "the appropriate phasing of [their] facilities" as driven by increased demand and enrollment. The Project was "designed such that each current institutional or individual owner may develop their property independent of development by other property owners." The Draft EIR further noted that future site-specific environmental review would be required for each new school by the responsible school district before approval of a design for a specific facility, and this review would consider environmental impacts not known when the Project EIR was prepared. And each future school, if constructed, would be subject to the relevant mitigation measures in the EIR.

The City received comment letters from the Districts, as well as from Alisal Union School District, during the comment period for the Draft EIR. These letters all raised the same concerns, some in verbatim language. They asserted that as a result of "the realities of school facilities funding," sufficient funding "may not be available" for the construction of new school sites, yet the

10

Draft EIR did not consider this "possibility" and contained no environmental evaluation of impacts related to the alternative of the Districts having to accommodate the new students at existing sites or by other means. The alternatives identified in the letters, with no further specification, included "any or all of" the following: installing portable classrooms at existing sites, expansion of or new facilities at existing sites, altering attendance boundaries, bussing, and inter-district transfers. The indirect and off-site environmental impacts flowing from these alternatives to accommodate new students were generally identified by the Districts, in conclusory terms, as including "increased traffic, air quality, noise, and other reasonably foreseeable impacts." The Districts both expressed that financing new schools with developer fees was "woefully optimistic," because that source of funds alone would still leave large shortfalls, even if additional efforts by the Districts to obtain more state-facilities school funding—an item in a "perpetual state of flux" and not certain to occur—were successful.

The City addressed these comments and letters from the Districts, along with the one from Alisal Union School District, in the Final EIR. As the comments had all been similar, if not exact, the responses were likewise repetitive. The City asserted that for several reasons, inadequate funding to school districts for the construction of new schools was not a matter required to be addressed in an EIR under CEQA, and that any need to expand existing facilities as a result of funding shortfalls for any new construction amounted to "economic or social effects" from a project that likewise did not require CEQA analysis. The City further contended that it could do no more under the law to mitigate school impacts because developer fees, which are set not by the City but by the school districts, "are deemed to be 'full and complete school facilities mitigation' for impacts caused by new development." The City further observed

11

that "[u]ltimately, the Education Code tasks the [s]chool [d]istrict with the responsibility for design and construction of their own schools" and it pledged support to the Districts "with the provision of infrastructure and land to facilitate school facility development, as well as the collection of school impact fees to fund new school development."

The City ultimately rested in the Final EIR on its inability to respond further to the Districts' expressed concerns and the potential environmental impacts they claimed to be related to their identified alternatives for accommodating new students at existing sites, because the City viewed the information as too speculative, uncertain, and vague. The City responded that "[t]he potential [alternative] scenarios . . . are too speculative to give rise to meaningful environmental assessment, particularly since, if they occur, they will occur over an extended period of time (perhaps 20 to 30 years), consistent with buildout of the Specific Plan area. Just as the number of students living in the Specific Plan Area will gradually ramp up over time, so too will the District have the ability to make decisions as to where such students will attend schools, if no on-site school facilities are yet in place. The specific decisions the District will have to make cannot be predicted with any level of certainty at present, and, in any event, are beyond the City's control. In particular, the City has no way at present to predict boundary changes the District might impose in future years. Although such decisions could affect traffic and other environmental resources, any details of such impacts cannot be predicted at present. The same is true of options such as student transfers, the construction of other . . . currently unplanned schools at other sites, or changes in patterns of school bussing. To the extent that the District contemplates the installation of additional portable classrooms at existing school facilities, the City notes that CEQA provides a categorical exemption (Class 14) for 'minor additions' to

12

existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, whichever is less."

### D. The District's Further Comments and Project Approval

On December 4, 2019, the Project came before the City's Planning Commission in a public hearing. The Project approvals under consideration were the Specific Plan, the Final EIR, a rezoning ordinance, and a development agreement. The Districts provided public comments at this hearing, emphasizing the purely economic point made in prior comment letters that school-facilities funding for the new schools identified in the Specific Plan was likely to be insufficient based on present scenarios. At the close of the hearing, the Planning Commission unanimously recommended approval of the Project to the City Council, including certification of the Final EIR and adoption of CEQA findings and a statement of overriding considerations.

On December 16, 2019, the Districts submitted another letter to the City, this time urging that the Final EIR did not adequately address environmental impacts resulting from the "phasing" of the Project, in that it did not include any information about the sequencing or scheduling of development or impose any restrictions on its timing. The Districts emphasized that the Final EIR provided no basis to assume that development of the Site would occur gradually and incrementally over the time expected for full build-out, and the Final EIR did not evaluate the possibility that a significant amount of development of the Specific Plan could occur simultaneously or all at once because of market conditions.

On December 17, 2019, the Districts submitted a final letter to the City. This letter further commented about the asserted inadequacies of the Final EIR as it concerned new school facilities and funding therefor. Specifically, it

13

described the "three-legged-stool" (state-bond-fund grants, developer fees, and local funding) for school funding under the law as adopted by the Legislature in 1998 in Senate Bill 50 (Ed. Code, § 17070.10 et seq., Stats. 1998, ch. 407, § 4, Leroy F. Greene School Facilities Act of 1998, (Sen. Bill 50)) and contended that due to what they considered a high improbability (or at least uncertainty) of ever obtaining sufficient state and local funding for new school-facilities development, SRUSD would likely not be able to construct the three new schools contemplated by the Specific Plan and assumed by the Final EIR, which would result in numerous indirect environmental impacts "on" existing facilities.[4] The letter also represented that SRUSD was not financially able to absorb these impacts perceived to be caused by the Project and that the payment of maximized developer impact fees would be insufficient to offset them. The letter urged the City "not to certify the EIR until the Project proponents have proposed additional, adequate mitigation to offset the anticipated impacts of the Project," none of which were specified in the letter that, again, emphasized the likelihood of a perpetual shortage of school-facilities funding.

The City Council's hearing for the Project's approvals took place on December 17, 2019. SRUSD's Board President spoke at the hearing and explained to the City Council that developer impact fees imposed as part of the

---

[4] The letter also pointed out that all three sources of funds of the "three-legged stool" would be altered, negatively so from the Districts' perspective, if Proposition 13 on the March 2020 ballot, a state bond measure (Voter Information Guide, Ballot Pamp., Primary Elec. (Mar. 3, 2020) text of Prop. 13, pp. 26–46) were to pass—yet another uncertainty affecting school-facilities funding at the time the Final EIR was certified. Proposition 13 was ultimately rejected by the voters.

14

Project would pay only about one-third of the costs for anticipated new schools, so the schools would thus not likely ever be built.

The City Council nonetheless unanimously approved the Project in its entirety, including certification of the Final EIR, and adoption of CEQA findings and a Statement of Overriding Considerations for the Specific Plan.

II.     *Procedural Background*

The Districts timely filed their petition for writ of mandate. As relevant here, the petition sought in its first cause of action for violation of CEQA[5] a peremptory writ of mandate setting aside the City's certification of the Specific Plan Final EIR and related project approvals.[6] The factual basis for the cause of action was the Final EIR's contemplated "construction of 4,340 new homes, which will generate approximately 2,000 new elementary and middle school students, as well as many high school students" and its "fail[ure] to properly address the probability that funding will not be available to fund new school facilities," coupled with the "probab[ility] that environmental impacts will result from construction activities at existing sites rather than the construction of new sites." Thus, the Final EIR was alleged to be deficient in that it made

[5] The Districts labeled the cause of action as having been brought under both traditional and administrative mandate under Code of Civil Procedure sections 1085 and 1094.5, respectively, and CEQA, specifically sections 21167, 21168, and 21168.5.

[6] The first cause of action under CEQA was related to what was labeled in the Districts' fifth cause of action for injunctive relief, which is not a cause of action but a remedy. (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 734 [permanent injunction is a remedy, not a cause of action, and it may not be issued if the underlying cause of action is not established].) The trial court here ruled and entered judgment in the Districts' favor on the fifth cause of action as though it were a separate cause of action. We will treat that ruling not as one on an independent cause of action but, rather, as the trial court having issued injunctive relief in the judgment as a remedy tethered to the CEQA violations it found in the first cause of action.

"the unsupported assumption that all environmental impacts associated with schools will come from the construction of new schools on new sites" and "did not evaluate what the Specific Plan's impact on the environment will be when existing sites inevitably have to house the new students [as contemplated by the Project], including construction and traffic[-]related impacts."

The cause of action further alleged that "there is nothing in the record demonstrating there will be enough funding from enough sources to construct new schools"; "developer fees most often do not cover impacts caused by [school] development"; "it is undisputed in the record that [the Districts] cannot meet the demands for new school construction caused by the anticipated influx of students" as a result of the Specific Plan; state funding, developer fees, and local bond funds, each for separate reasons, are likely to be insufficient for the Districts to build the new schools contemplated by the Specific Plan and the Final EIR fails to acknowledge the inadequacies of these funding sources; and "there are foreseeable environmental impacts connected with adding or modifying school facilities at existing school sites" to alternatively accommodate the new students brought by development under the Specific Plan but the Final EIR "does not evaluate" them.

The second component of the Districts' alleged CEQA violations was the assertion that the City as lead agency did not comply with Guidelines section 15088, subdivision (c), in that it "failed to provide adequate responses to [the Districts'] contentions" made before certification of the Final EIR about the "lack of adequate funding for new schools and unanalyzed environmental impacts on existing facilities." Instead of providing responsive "good faith, reasoned analysis," the City first responded that Government Code section 65996, subdivision (a) " 'obviated the need to analyze and mitigate a development's direct impacts on existing school facilities in an EIR because

16

[the] Education Code sets forth the "exclusive methods" for consideration and mitigation of such impacts' " under CEQA. Next, as alleged by the petition, the City contended that the "scenarios described by [the Districts] are somehow 'too speculative to give rise to meaningful environmental assessment, particularly since, if they occur, they will occur over an extended period of time (perhaps 20 to 30 years), consistent with buildout of the Specific Plan Area.' " Both positions were alleged by the Districts to be an inadequate response under CEQA, and the City provided "no justification for failing to analyze the more probable environmental impacts related to school facilities in the [Final EIR. The City] is not entitled to analyze a scenario that has little chance of occurring (construction of new schools), and then claim that even though there is a far more likely scenario, the impacts that would arise do not need to be analyzed at this time."

The pleadings were joined in the trial court and the matter briefed for hearing, which occurred on April 19, 2021.[7] The Districts' briefing with respect

---

[7] The second cause of action was also in mandate, challenging the Project for violations of the planning and zoning law concerning consistency with the City's General Plan (Gov. Code, § 65000 et seq.), and the third alleged violations of the Brown Act (Gov. Code, § 54950, et seq.) in connection with the Specific Plan's approvals by the City's Planning Commission. The fourth cause of action merely restated the first three but sought declaratory relief, and the fifth, as noted, sought injunctive relief resting on the previously alleged law violations. The trial court granted judgment on the pleadings against the Districts on the third and fourth causes of action before reaching the merits of the rest. In later addressing the merits, the court ruled against the Districts on the second cause of action for their failure to exhaust administrative remedies. The scope of the real parties' appeal is limited to their challenges to the trial court's ruling in favor of the Districts on the first cause of action for CEQA violations and the injunctive relief provided for those violations to the extent captured in what is labeled the fifth cause of action. We therefore do not address the trial court's rulings beyond these.

17

to the alleged CEQA violations likewise argued, as they maintain on appeal, that the Draft and Final EIRs evaluated environmental impacts related to schools only on the erroneous assumption that new schools would be constructed and failed to "adequately inform the public that due to the high probability of a lack of sufficient funding to build new schools, there will be significant environmental impacts, including impacts related to traffic, utilities, and public services, due to the inevitable need to modify the Districts' [existing] facilities to accommodate the influx of new students." The Districts' briefing further emphasized that in responding to comments on the Draft EIR, the City had failed to provide a justification for not analyzing significant environmental impacts relating to existing school facilities or a good faith, reasoned analysis for not doing so.

In pressing their arguments, the Districts urged that their claims were predominantly those of " 'improper procedure' " under CEQA by the City having omitted essential information from the EIR or having failed to address a necessary issue, warranting de novo judicial review under *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 (*Banning Ranch*) and *Vineyard Area Citizens for responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).

For their part, the real parties' briefing below, filed jointly with the City, framed the CEQA issues before the court as factual conclusions and quasi-legislative decisions by the City as lead agency subject to deferential substantial evidence review specific to CEQA (§ 21080, subd. (d); Guidelines, § 15384), and as distinct from administrative mandamus review of a quasi-adjudicative decision under Code of Civil Procedure section 1094.5. The issue as so framed was argued to be whether the EIR's discussion of the potentially significant school impacts was adequate, generally a mixed question of law and fact, but

here urged to be predominating with factual questions, such as which methodologies the City chose to employ for analyzing school-related environmental impacts. (See, e.g., *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 331, citing *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*Sierra Club*).)

At core, real parties' arguments were, and remain, premised on the characterization of the Districts' assertions about future insufficient funding for new-school construction as contemplated by the Specific Plan, and related off-site impacts because of asserted necessary alternative accommodations at existing facilities over a 20-30-year span, as purely speculative and uncertain and not reasonably foreseeable under CEQA. According to real parties, such speculation and uncertainty did not give rise to a legal duty for the City to either evaluate these vague and generalized impacts or to provide further response to such comments. (See e.g., Guidelines, § 15145.) Real parties further contended that the Final EIR, a program-level document in certain aspects (see Guidelines, § 15168), was adequate under CEQA, and for several reasons, the City was not required to provide analysis on uncertain and only generalized alternatives based on speculation about insufficient funding for new school construction well into the future. These reasons included that analysis of and mitigation for impacts to schools is limited by CEQA and other law (see Gov. Code, § 65996, subd. (a) [exclusive methods of considering and mitigating impacts on school facilities resulting from planning or development project]; Ed. Code, § 17620 [development of school impact fees by district levy]). And because the Districts had provided no specificity or plans as to which alternative accommodations as to which existing school sites might be made, and any such plans were solely within the Districts' control, generalized environmental review by the City of those impacts based on the vague information the

19

Districts had provided would not be meaningful. Further, the identified alternatives to construction of new schools within the Specific Plan would either independently require later site-specific CEQA review by the Districts or would be exempt.

As to the charge that the City had not in the Final EIR adequately responded to the Districts' comments, real parties contended the City's responses were sufficient in that a lead agency may conclude that information about potential environmental impacts is speculative, in which case the agency must so conclude and then terminate discussion of those impacts. (Guidelines, § 15145.) Further, the City observed that the level of detail required in a response may correspond to the level of detail in the comment (see Guidelines, § 15088, subd. (c)) and that the dispute about the City's level of response to comments rested not on its avoidance of a response but on a legal disagreement about whether the City was required to conduct an analysis based on speculation and uncertainty that would not lead to meaningful analysis or information.

The trial court held the merits hearing on April 19, 2021.[8] On the Districts' CEQA claim, the court at the outset characterized the issue as "whether the [EIR] omits material necessary to [reasonable] decision[-]making and informed public participation as required by CEQA." The court further queried whether "[n]otwithstanding the lack of precision or specificity around the specific school[-]expansion scenario such as portables or reorganization of boundary lines or bus[s]ing, . . . was the City nonetheless required to discuss at

---

[8] The court's written ruling after the hearing did not itself contain lengthy discussion or analysis, but it incorporated by reference and attached the full hearing transcript containing the parties' arguments and the court's expressed reasoning.

least in general terms the potential environmental impacts of a scenario in which existing school facilities would have to accommodate new students due to the lack of funding or any other foreseeable problems to construct[ing]" new schools. And "does the record sufficiently explain why the City chose to analyze the impacts of constructing new schools and not the impacts of existing facilities absorbing new students when it seem[s] there is arguably evidence in the record to suggest that the latter was possible and more likely than the former?"

As to the applicable standard of judicial review, the court questioned the existence of any relevant factual determinations by the City that might lead to deferential review for substantial evidence. The court asked whether the "City [had] made a factual determination, such as an agency's decision to use a particular methodology," in omitting discussion of the Districts' alternative scenarios as opposed to constructing the new school facilities as contemplated by the Specific Plan.

In the end, the trial court concluded from the administrative record that "it was reasonably foreseeable that existing school facilities would need to be expanded or adjusted in some way to accommodate the influx of new students from the" Specific Plan and that the EIR failed to fulfill its informational "purpose because it did not disclose all potential school-related environmental impacts that could result." This was because the Final EIR "only addressed impacts from the construction of new schools and failed to include potential impacts arising from the expansion of existing school facilities, and those impacts are external to the facility, not on the facility." The court also concluded that the EIR "failed to adequately respond to [the Districts'] comments."

The court was careful to delineate the indirect, off-site impacts that, in its view, required further environmental review and comment, recognizing the distinction drawn by *Chawanakee Unified School District v. County of Madera*

21

(2011) 196 Cal.App.4th 1016, 1026–1028 (*Chawanakee*) between indirect impacts more broadly *related to* modification of existing school facilities and impacts *on* those facilities, with only the latter considered fully mitigated under Government Code sections 65995 and 65996. The court indicated it would grant the writ as to the CEQA cause of action because the City had failed to proceed in the manner required by law, and would order that "no further entitlements be granted until the City complies with the writ of mandate." (Capitalization omitted.) The court directed the Districts' counsel to prepare a proposed order after hearing.

On June 23, 2021, the court entered its written order ruling on the merits of the various causes of action alleged in the Districts' petition, including the third and fourth as to which the court had previously granted judgment on the pleadings against the Districts. The order granted the petition on the CEQA cause of action, concluding that the Final EIR "was insufficient because [it] failed to include discussion of potential off-site environmental impacts resulting from the [Specific Plan] due to [the Districts'] presented concerns that [they] will lack sufficient funding to build the proposed new school sites identified within the [Specific Plan]. The [Final EIR] also failed to adequately respond to comments made by [the Districts] with regard to potential off-site impacts. As such, [the City] failed to proceed in accordance with the law under CEQA." The order also generally granted related injunctive relief as pleaded by the fifth cause of action, "enjoining [the City] from approving any further development entitlements within the [Specific Plan] until such time that [the City] complies with the peremptory writ of mandate to be issued by the Court" (capitalization omitted) in relation to the CEQA cause of action. The order denied relief on the second cause of action and finally directed the Districts' counsel to prepare a

22

proposed judgment and peremptory writ of mandate "for the court's consideration."

Two months later, on August 24, 2021, the trial court entered a stipulated order "regarding stay of entry of judgment . . . to allow [the] parties time to discuss settlement." (Capitalization omitted.) The order referenced the deadline for appeal from the prior merits order, and assumed that any appeal here would be from a later judgment and not the merits ruling entered on June 23, 2021. The stipulated stay order expressly contemplated the court's later entry of judgment and issuance of a peremptory writ of mandate incorporating the prior merits rulings should the parties be unable to reach a settlement for a different disposition.

After the expiration of the stipulated stay of entry of judgment, on December 27, 2021, the court noticed a hearing re "[c]larification of judgment and orders" to occur the next day. (Capitalization omitted.) During the hearing, the court acknowledged having received a proposed judgment and other related submissions from the parties. The clarification the court provided, seemingly prompted by a dispute among the parties, was the narrow scope of the injunctive relief to be ordered—no further Specific Plan approvals or entitlements to be granted until the City complies with the court's directive to provide a generalized discussion and further responses to comments in the Final EIR about the alternative off-site impacts of the Districts' accommodation of new students in existing facilities as opposed to the construction of new schools. The court made explicit that it was not directing the set-aside or vacation of prior Project approvals. Because of this narrow focus, the court directed modifications to the Districts' proposed judgment and writ of mandate, including specific language under section 21168.9 for severance of portions of a project and the court's retention of jurisdiction, as jointly proposed by the City

23

and real parties. The judgment entered three weeks later on January 18, 2022, reflected those remedial and severance provisions under section 21168.9 and clarified that the court was not suspending or setting aside prior Project approvals but rather employing severance and enjoining the City's approvals of any further development entitlements within the Specific Plan until such time that the City complied with the court's "limited relief" in the judgment and writ. The separate peremptory writ of mandate likewise reflected this narrow relief.

Notice of entry of judgment was served the next day, on January 19, 2022. The real parties filed their notice of appeal from the judgment on February 8, 2022.

## DISCUSSION

I.     *Appealability*

As addressed by real parties in their opening brief, the City as lead agency and respondent in the writ action below did not appeal from the judgment and has chosen to voluntarily comply with the trial court's judgment and writ, effectively waiving the right to appeal. (*Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750–1751 (*Save Our Residential*), citing *Bruce v. Gregory* (1967) 65 Cal.2d 666, 671.) Voluntary compliance with a writ of mandate by the City would likely moot its right to appeal in any event. (*Save Our Residential*, at pp. 1750–1751.) But such compliance by the City as lead agency does not eliminate or waive a real party in interest's independent right to appeal, where that party is exposed to an award of attorney fees as a result of the trial court's action, as real parties represent they are here.[9] (*Ibid.* [agency may voluntarily comply with trial court writ while real party in interest defends on appeal agency action giving rise to

_____

[9] The parties here have stipulated to defer the issue of attorney fees until after this appeal is resolved.

the writ]; *Protect Niles v. City of Fremont* (2018) 25 Cal.App.5th 1129, 1140 (*Niles*) [appeal by real party in interest not moot when lead agency's prior approval of project would be restored if real party's appeal is successful].) The City here has recognized that if real parties prevail on appeal, then the City's December 2019 certification of the EIR will stand, even though the City is preparing a supplemental EIR in the meantime in compliance with the trial court's judgment and writ. The appeal is therefore not moot notwithstanding agency compliance with the writ because its prior 2019 certification of the Final EIR may be restored should the real parties prevail on appeal and an award of fees depends on the propriety of the trial court's determination. (*Save Our Residential*, at pp. 1750–1751; *Niles*, at p. 1140.)

Accordingly, real parties' appeal from the judgment here is ripe for review and not moot even though the City did not also appeal and has chosen to voluntarily comply with the trial court's judgment and writ, pending resolution of the appeal.

A separate issue relating to the timeliness of the notice of appeal is also present here.[10] As noted, the trial court issued its order ruling on the merits of the Districts' mandate petition on June 23, 2021, with notice of its entry served that day. But the court did not enter judgment—granting relief in mandate on the Districts' CEQA cause of action with related remedies and denying relief on three other causes of action—until seven months later, on January 18, 2022, after noticing and conducting a hearing to clarify the scope and contents of the judgment, including the statutory CEQA remedies under section 21168.9 the court had in mind, given its prior rulings. Although the June 2021 merits order

_____

[10] We previously issued an order to show cause to appellants on this appealability issue and have reviewed their response. The order to show cause was previously discharged by separate order.

directed the Districts to submit a proposed judgment and peremptory writ of mandate, the certain statutory CEQA remedies contained in the later judgment as clarified by the court at the hearing in the interim were omitted from its prior merits order. A separate writ document was issued by the court clerk the same day judgment was entered.

And as noted in the judgment, some three months after the trial court entered its order ruling on the merits, the court signed a stipulated order "regarding stay of entry of judgment" (capitalization omitted) to allow the parties time to discuss settlement and the possibility of an agreeable stipulated judgment given the court's merits ruling. This pre-judgment stipulated order provided that " '[t]he time period for the parties to submit either a proposed peremptory writ of mandate or a proposed judgment for the court's consideration, as contemplated by the [prior merits] order, is extended for a period of 75 days.' " (Capitalization omitted.) The 75-day period passed, but judgment was not entered until January 18, 2022, some two and a half months later and after the hearing at which the court clarified the scope and content of the narrow remedies to be ordered. Real parties filed their notice of appeal from the judgment on February 8, 2022, which is timely from the judgment but not from the court's prior order ruling on the merits if that is the trial court's appealable determination in this case.

In *Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, review granted June 15, 2022, S274147 (*Meinhardt*), our colleagues in Division One of the Fourth Appellate District held that a ruling denominated an " 'order' " in a mandate case was an appealable final judgment even though a separate document styled a " 'judgment,' " which "merely restated the prior" order, followed. (*Id.* at p. 51.) The *Meinhardt* court dismissed the appeal as the notice

26

of appeal, while timely filed from the later "judgment," was not timely filed from the prior order denying the petition. (*Id.* at pp. 50–51.)

Relying on *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109, 1113 (*Dhillon*), the court in *Meinhardt* reiterated that " ' " [a]s a general test, which must be adapted to the particular circumstances of the individual case, . . . where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action . . . is essential to a final determination of the rights of the parties, the decree is interlocutory.' " ' " (*Meinhardt*, 76 Cal.App.5th at p. 49, review granted, quoting *Dhillon*, at p. 1115.) Applying this test, as stated, the court in *Meinhardt* concluded that the initial order there was a final judgment subject to appeal regardless of its title or form and notwithstanding entry of a later "judgment," because the order effectively denied the mandate petition in its entirety and did not contemplate any further action in the case. (*Meinhardt*, 76 Cal.App.5th at p. 63; see also *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409; *City of Calexico v. Bergeson* (2021) 64 Cal.App.5th 180, 190 [order denying mandate petition disposing of all claims between the parties is an immediately appealable final judgment]; *Laraway v. Pasadena Unified School Dist.* (2002) 98 Cal.App.4th 579, 583 [same]; *Valero Refining Co.-California v. California Bay Area Quality Management Dist. Hearing Bd.* (2020) 49 Cal.App.5th 618, 633, fn. 10 ["the appealable judgment was the court's order granting writ of mandate, not a 'judgment' it subsequently entered"].)

The denial order in *Meinhardt* disposed of all issues between the parties and did not address further action, including the preparation of another order or judgment; it was therefore treated as a final and appealable judgment and the period to appeal was not restarted by the later entry of a document styled a

"judgment" that simply reiterated the rulings in the prior order. (*Meinhardt, supra,* 76 Cal.App.5th at p. 63, review granted; *Dhillon, supra*, 2 Cal.5th at p. 1115 [order granting or denying petition for writ of mandate in its entirety, when such order contemplates no further action in the case, concludes the special proceeding of a civil nature].) As stated in *Natomas Unified School District* (2022) 86 Cal.App.5th 1013, 1027 (*Natomas*), what the Supreme Court precisely said in *Dhillon* (2 Cal.5th at pp. 1113–1114, with italics added) was that a " 'trial court's judgment granting administrative mandamus, *and ordering the substantive relief sought by the petitioner*, is a final judgment.' "

Applying these principles here to confirm our appellate jurisdiction, we conclude that the trial court's order ruling on the merits of the petition in June 2021 was not the appealable determination, and that the real parties' notice of appeal from the later judgment was timely filed. First, the earlier merits order itself contemplates and directs the later preparation of a judgment and a separate writ document. But more than that, and as real parties point out, in the merits order, the trial court did not articulate the specific and narrow statutory CEQA remedies it would direct as a consequence of its rulings granting the mandate petition, and the court noticed and held a hearing before judgment was entered to clarify and address the specific remedies to be included in the judgment. Thus, the prior order did not finally determine the rights of the parties by specifying the statutory relief the Districts would receive, which led to disputes over the appropriate terms of the judgment and writ that were resolved by the court at later hearing. (See *Natomas, supra,* 86 Cal.App.5th at pp. 1026–1027 [post-order disputes about terms of judgment that required a hearing on scope and terms of relief to be granted support appealability of later judgment].) And while the judgment here simply restates the prior order's merits rulings on the various causes of action, it substantively

28

does more in its specification of specific statutory CEQA remedies. Further, although the separate order entered between the merits order and the judgment "staying" the entry of judgment could not have affected the appealability of the merits order had that order effectively been the final judgment, and further could not have extended the time for appeal, because the judgment entered in January 2022 is the court's final and appealable determination, the terms of the interim stay order are irrelevant to the timeliness of the appeal.

We thus conclude that here, unlike in *Meinhardt*, it is the later judgment (entered in January 2022) and not the prior merits order that is the "final determination of the rights of the parties" (Code Civ. Proc., § 1064) and which finally terminated the litigation between them on the merits of the case. (*Dhillon, supra*, 2 Cal.5th at p. 1115 ["a judgment is final, and therefore appealable, ' " ' "when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined" ' " ' "]; see also *Natomas, supra*, 86 Cal.App.5th at pp. 1026–1027.) As the real parties timely appealed from the later final judgment, we have jurisdiction to review the appeal.

II.    *The EIR in CEQA Overview*

We begin with a general overview of the CEQA statutory scheme, at the heart of which is the EIR.

CEQA "and the regulations implementing it ([Guidelines]) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or

29

mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' " (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*), quoting Guidelines, § 15002.)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra*, 54 Cal.4th at p. 286.) If the proposed activity is a " 'project,' " the second step requires the public agency to decide whether it is exempt from compliance with CEQA under narrow circumstances. (*Ibid.*, citing §§ 21080, 21084, subd. (a); Guidelines, § 15300.) "If a project does not fall within a CEQA exemption, the lead agency conducts an initial study to determine whether the project may have a significant impact on the environment. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380 [(*Muzzy Ranch*)]; [Guidelines, §§ 15063, subd. (a), 15002, subd. (k)(2).]" (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1002.) "If the administrative record before the agency contains substantial evidence that the project may have a significant effect on the environment … it must go to the third stage of the CEQA process: preparation and certification of an EIR. (§§ 21100, 21151; Guidelines, §§ 15002, subd. (k)(3), 15063, subd. (b)(1), 15064, subds. (a)(1), (g)(1), 15362.)" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1372.)

"As a general proposition, CEQA depends on the EIR. 'An environmental impact report is an informational document,' the purpose of which 'is to provide

public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list the ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (. . . § 21061.) According to our Supreme Court: 'The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting " 'not only the environment but also informed self-government.' " [Citation.] The EIR is the heart of CEQA, . . .' [Citation.]" (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 724–725, fn. omitted (*Tiburon*).)

" 'A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment. (. . . §§ 21100, subd. (a), 21151, subd. (a); Guidelines, § 15064, subd. (a)(1).) The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements. (. . . §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125.)' " (*Tiburon, supra*, 78 Cal.App.5th at p. 725.) The relevant geographic area for CEQA evaluation of a project's environmental impacts is not limited to the project boundaries and is " 'the area which will be affected by a proposed project.' " (*Muzzy Ranch, supra*, 41 Cal.4th at p. 387, citing § 21060.5.)

" 'The agency must notify the public of the draft EIR, make the draft EIR and all documents referenced in it available for public review, and respond to comments that raise significant environmental issues. (. . . §§ 21091, subds. (a), (d), 21092; Guidelines, §§ 15087, 15088.) The agency must also consult with and obtain comments from other agencies affected by the project and respond to

31

their comments. (. . . §§ 21092.5, 21104, 21153; Guidelines, § 15086.) It must prepare a final EIR including any revisions to the draft EIR, the comments received from the public and other agencies, and responses to comments. (Guidelines, §§ 15089, subd. (a), 15132.)' " (*Tiburon, supra*, 78 Cal.App.5th at p. 725.)

" 'An agency may not approve a project that will have significant environmental effects if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects. (. . . §§ 21002, 21002.1, subd. (b); Guidelines, § 15021, subd. (a)(2); [Citation].) An agency may find, however, that particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (. . . § 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each significant effect, based on substantial evidence in the administrative record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; (2) those measures are within the jurisdiction of another agency and have been adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other benefits outweigh the significant environmental effects. (. . . §§ 21081, 21081.5; Guidelines, § 15091, subds. (a), (b).) A finding that specific overriding project benefits outweigh the significant environmental effects (. . . § 21091, subd. (b)) is known as a statement of overriding considerations. (Guidelines, § 15093.)" (*Tiburon, supra*, 78 Cal.App.5th at pp.725–726.)

" 'Thus, a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the

environmental consequences of its actions, mitigate adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process. The purpose of these requirements is to ensure that public officials and the public are aware of the environmental consequences of decisions before they are made.' [Citation.]" (*Tiburon, supra*, 78 Cal.App.5th at p. 726.)

At the same time, "[t]oo much should not be expected of an EIR. It is not to have the exhaustive scope of scientific textbook. 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Guidelines, § 15151.)" (*Tiburon, supra*, 78 Cal.App.5th at p. 726.)

"Much of what goes into an EIR is left to the discretion of the agency preparing it. The leading treatise summarizes: 'The lead agency has discretion to design the EIR and need not conduct every recommended test or perform all required research. [Citations.] An EIR is not required to address all of the variations of the issues presented. [Citations.] An analysis of every permutation of the data is not required.' (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2022) § 11.28, pp. 11-19–11-20 [(Kostka & Zischke)]; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 (*Laurel Heights*) ['A project

opponent . . . can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary'].) [¶] . . . 'Drafting an EIR or preparing a negative declaration necessarily involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can.' (Guidelines, § 15144.)" (*Tiburon, supra*, 78 Cal.App.5th at pp. 726–727.)

Thus, " '[t]he fact that precision may not be possible … does not mean that no analysis is required.' " (*Banning Ranch, supra,* 2 Cal.5th at p. 938, citing *Laurel Heights, supra*, 47 Cal.3d at p. 399.) Still, an "EIR is not required to engage in speculative analysis. (Guidelines, § 15145.) Indeed, this core principal is well[-]established in the Guidelines and case law. While a lead agency must use its 'best efforts' to evaluate environmental effects, including the use of reasonable forecasting, 'foreseeing the unforeseeable' is not required, nor is predicting the unpredictable or quantifying the unquantifiable. (Guidelines, § 15964, subd. (d)(3) ['A change which is speculative or unlikely to occur is not reasonably foreseeable']; *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 108 [' "agency is required to forecast only to the extent that an activity could be reasonably expected under the circumstances" '].) [¶] This rule rests on both economic and practical considerations. It has long been recognized that premature attempts to evaluate effects that are uncertain to occur or whose severity cannot reliably be measured is 'a needlessly wasteful drain of the public fisc. [Citation.]' ([Citation]; see, e.g., *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1450–1451 [an EIR for a subdivision of single-family residences was not deficient in failing to consider the possibility that the future lot owners might build a second dwelling on their lot pursuant to a local ordinance allowing such dwellings, because possibility

34

was remote and speculative].)" (*Treasure Island, supra,* 227 Cal.App.4th at pp. 1060–1061.)

CEQA review is thus not triggered where there is not yet an identifiable impact as until that point, the review process could not be meaningful in the sense that it allows consideration of alternatives that could mitigate the impact. (*Friends of the Sierra Railroad v. Tuolomne Park & Recreation District* (2007) 147 Cal.App.4th 643, 657–659 [reasonably foreseeable likelihood of some development plus possibility that the development could impact historical resource did not require EIR that could only speculate on future environmental consequences]; see also *Laurel Heights, supra*, 47 Cal.3d at p. 396 [premature environmental analysis before a particular use or proposal is reasonably foreseeable may be deferred as it may be meaningless and financially wasteful].)

"The judicial attitude to EIRs is deferential. . . . It follows that courts 'do not require technical perfection or scientific certainty.' (*Sierra Club[, supra,* 6 Cal.5th at p. 515].)" (*Tiburon, supra*, 78 Cal.App.5th at p. 727.) As noted, reviewing courts " ' " " 'have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' [Citations.]" (*Sierra Club*, at p. 515; see Guidelines, § 15151 [sufficiency of EIR viewed in light of what is reasonably feasible].)

III.   *The Standard of Review*

On appeal, the parties reprise their respective positions taken in the trial court, as outlined above, on the adequacy of the Final EIR.

" ' " ' "An EIR is presumed adequate," ' " ' " and the party challenging its adequacy " ' " ' "has the burden of proving otherwise" ' " ' " by establishing a " ' "prejudicial abuse of discretion." ' " (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 329

(*South of Market*); see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

"In evaluating the adequacy of an EIR, the appellate court reviews the agency's actions, not the trial court's decision. [Citations.] 'The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion.' (*Sierra Club, supra*, 6 Cal.5th at p. 512.) 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5.)" (*Preservation Action Council v. City of San Jose* (2023) 91 Cal.App.5th 517, 532 (*Preservation*).)

" ' "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." ' " (*South of Market, supra*, 33 Cal.App.5th at p. 331; see also *Vineyard, supra,* 40 Cal.4th at p. 428 [absence of information in an EIR may be a failure to proceed in a manner required by law under § 21061].) "But, failing to include information 'normally will rise to the level of a failure to proceed in the manner required by law only if the analysis in the EIR is clearly inadequate or unsupported. [Citation.]' [Citation.]" (*Treasure Island, supra*, 227 Cal.App.4th at p. 1046.) "A challenger . . . asserting inadequacies in an EIR must show the omitted information 'is both required by CEQA and necessary to informed discussion. [Citations.]' [Citation.]" (*Id.* at pp. 1046–1047.) " 'Only if the manner in which an agency failed to follow the law is shown to be prejudicial, or is presumptively prejudicial, as when the [lead agency] fails to comply with mandatory procedures, must the decision be set aside . . . .' [Citation.]" (*Environmental Protection Information Center v. California Department of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 485 (*Environmental*

*Protection*).) The failure to comply with mandatory procedures gives rise to presumptive prejudice when the result is a subversion of CEQA's purposes; for example, if the absence of information frustrated public comment or made meaningful assessment of potentially significant environmental impacts impossible. (*Id.* at pp. 485–486.)

Judicial review for a claimed failure to proceed in the manner required by CEQA, on the one hand, or for reaching factual conclusions unsupported by substantial evidence, on the other hand, "differs significantly: [w]hile we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard, supra,* 40 Cal.4th at p. 435.) "These differences require the 'reviewing court [to] adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.' (*Ibid.*; accord, *Sierra Club, supra*, 6 Cal.5th at p. 512 [recognizing 'a procedural issues/factual issues dichotomy' with respect to the CEQA standard of review].) Consistent[ly] with the differentiated standards stated above, we independently review the administrative record for ' "any legal error" by the agency and deferentially consider[] whether the record "contains substantial evidence to support [the agency's] factual determinations." ' (*Protecting Our Water* [& *Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479,] 495; see *Sierra Club*, [*supra*, 6 Cal.5th] at p. 512.)" (*Preservation, supra*, 91 Cal.App.5th at p. 532.) Under CEQA, "[s]ubstantial evidence shall include facts, reasonable assumptions predicated on facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); see also Guidelines, § 15064, subd. (f)(5).) It does not include "argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or

evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment." (*Ibid.*)

But "the distinction between de novo and substantial evidence review 'is not always so clear.' [Citation.] The Supreme Court acknowledged this difficulty in *Sierra Club*. It explained that while 'there are instances where the agency's discussion of significant project impacts may implicate a factual question that makes substantial evidence review appropriate' ([*Sierra Club, supra*, 6 Cal.5th] at p. 514), courts 'have consistently recognized that adequacy of discussion claims are not typically amenable to substantial evidence review.' (*Id.* at p. 15.) That is, '[t]he determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions.' (*Id.* at p. 516.) Rather, '[t]he ultimate inquiry . . .is whether the EIR includes enough detail "to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." ' (*Ibid.*) That inquiry, which presents a mixed question of law and fact, 'is generally subject to independent review.' (*Ibid.*)" (*Preservation, supra*, 91 Cal.App.5th at pp. 532–533, citing *Sierra Club*, at p. 516.) Still, "underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. [Citations.] Thus, to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted. [Citation.]" (*Sierra Club, supra*, 6 Cal.5th at p. 516.)

Here, the central issue is whether the Final EIR for the Specific Plan was adequate under CEQA notwithstanding that it did not discuss the possibility that sufficient funding would never become available to build the contemplated

new schools within the Site and, in that event, the Districts might be required to absorb increased student enrollment through alternatives. These included modifications to existing school facilities, some located outside the Project Site. And some of the possible alternatives potentially would present off-site and indirect environmental impacts. The parties dispute the standard of review to be applied, the Districts urging independent review and the real parties emphasizing the factual nature of the City's determination of the Districts' information as speculative.

We view the question presented ultimately as whether the Final EIR complied with CEQA, that is whether it fulfilled statutory and regulatory mandates and whether the identified omission impaired the EIR's "purpose as an informational document" (*Sierra Club, supra*, 6 Cal.5th at p. 516), which purpose, as noted, is " 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Id*. at p. 516; see Guidelines, § 15151 [EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information that enables them to make a decision which intelligently takes account of environmental consequences].) The question of the EIR's sufficiency here does not necessarily turn on underlying factual determinations, although the City's assessment of the information provided by the Districts as uncertain and speculative is a factual question. (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1186 (*Anderson*) [substantial evidence supported agency's factual conclusion that asserted environmental impact of urban decay was speculative and not reasonably foreseeable].) Review here is thus not solely a matter of discerning whether there is substantial evidence in the record to support such factual conclusions. (See *Sierra Club*, 6 Cal.5th at p. 516.) It is rather a "mixed question [of law and fact] requir[ing] a determination whether

statutory criteria were satisfied" to which we will apply independent review while affording deference to any relevant underlying factual determinations by the City. (*Ibid.*; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [substantial evidence standard applies to the reliability or accuracy of the data upon which EIR relied].)

As to the Districts' claim that the City failed to respond or did not adequately respond to their public comments, such a claim is likewise one for the failure to proceed in a manner required by CEQA and is reviewed for prejudicial abuse of discretion.[11] (*Environmental Protection, supra*, 44 Cal.4th at p. 487.)

IV.  *School Facilities and Funding as Treated Under CEQA*

Both sides to this appeal appear to contend that *Chawanakee* and its construction of Government Code section 65996 support their respective positions. While we view the case as relevant to the issues here, it is not dispositive, given the narrow way in which the trial court found the Final EIR and the City's responses to the Districts' public comments to be inadequate—by failing to generally discuss and respond to comments about off-site, indirect impacts of the Districts' accommodating additional students at existing school sites or by other means—and the equally narrow writ relief the trial court ordered. We therefore provide some discussion of this case and the law on school facilities and funding as treated under CEQA.

---

[11] On this record in which the City *did* respond to the Districts' comments in the Final EIR, albeit not in a manner or to the degree that the Districts contend was required, we do not view the claim as one for the failure by the City to have considered comments altogether. (*Environmental Protection, supra*, 44 Cal.4th at p. 487, fn. 9 [drawing distinction between a claim of failure to consider public comments versus a failure to adequately respond].)

We first observe that before the legislative changes on school-facilities funding addressed in *Chawanakee*, the court of appeal in *Goleta Union School District v. Regents of University of California* (1995) 37 Cal.App.4th 1025 (*Goleta*) held that the UC Regents, as lead agency for a long-range development plan for university projects that would increase enrollment in a local elementary school district, had no obligation to propose or commit funds for methods to alleviate overcrowding in local public schools expected to result from the project. (*Id.* at pp. 1028, 1033–1034.) The basis for the court's holding was that CEQA requires consideration only of "physical change[s]" in the environment (§ 21065; cf. § 21060.5), and that the "[e]conomic or social effects of a project shall not be treated as significant effects on the environment" (Guidelines, § 15131, subd. (a)). (*Goleta*, at pp. 1030–1033.)

The supplemental EIR in *Goleta,* ordered after the trial court had found a CEQA violation and granted a writ of mandate*,* described impacts of the proposed development plan, and proposed various options for schools that included building classrooms to accommodate additional students, redistributing students to other facilities, starting year-round schools, adding portable classrooms, and building new classrooms. (*Goleta, supra,* 37 Cal.App.4th at p. 1029.) The supplemental EIR noted that mitigation of the physical environmental impacts associated with these options was the responsibility of the school district, but the Regents offered to contribute "a fair share." (*Ibid.*) The court recognized that in some cases, "socio-economic effects may cause physical changes that significantly affect the environment under . . . CEQA" (*id.* at p. 1032) but that "classroom overcrowding, per se, does not constitute a significant effect on the environment." (*Ibid.*) Still, a project ultimately requiring physical changes in the environment "such as construction of new school facilities, new bus schedules and changed traffic patterns" would

41

require an EIR to address these impacts. (*Ibid.*; see also *Fullerton Joint High School District v. State Board of Education* (1982) 32 Cal.3d 779, 794, criticized on other grounds in *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 917–919; *El Dorado Union High School District v. City of Placerville* (1983) 144 Cal.App.3d 123, 131 (*El Dorado*) [although increased student enrollment and potential for overcrowding might not implicate CEQA per se, evidence of present overcrowding and projections of increasing enrollment that would likely necessitate constructing a new school, changing bus routes, and altering traffic patterns is sufficient to require an EIR].)

The *Goleta* court found that the projected increases in school enrollment there, which were not considered to be sizable, did not themselves constitute a significant effect on the environment, so the supplemental EIR was not required to show that the development plan alleviated the increased enrollment. Further, the Regents had no responsibility to "tell the [d]istrict what it should do to increase capacity." (*Goleta, supra,* 37 Cal.App.4th at p. 1033, citing § 21080, subd. (b).) The supplemental EIR sufficiently provided information about potential physical impacts that may result from implementing the development plan and it discussed a wide variety of mitigation measures for these possible impacts. (*Ibid.*) It was not required to do more, including committing the Regents to provide funding to build classrooms. (*Id.* at pp. 1028, 1034.)

As discussed in *Chawanakee*, Sen. Bill 50 concerning school-facilities funding, was enacted in 1998. Among its provisions were changes to Government Code section 65996, subdivision (a), which is a "restriction on the 'methods of considering and mitigating impacts on school facilities' caused by a

42

development project."[12] (*Chawanakee, supra*, 196 Cal.App.4th at p. 1021.) The initial enactment of this statute in 1986 (stats. 1986, ch. 887, § 11) followed questions in the years after CEQA's initial enactment about its "application to development projects that caused an increase in student enrollment and overcrowding in schools" (*Chawanakee,* at p. 1021*)* and case law to the effect that the impact of increased school enrollment was cognizable under CEQA. (*Ibid.*; see *El Dorado*, *supra*, 144 Cal.App.3d at pp. 126, 131–132.) In 1986, the Legislature enacted "a complex statutory scheme to govern the imposition of school facilities fees on those seeking the government approvals needed to develop real estate. [Citation.] The school facilities legislation (1) allowed school districts to levy a charge against new developments to fund construction of school facilities but capped the amount that could be charged and (2) limited the types of mitigation requirements local government could impose against a development project to alleviate the project's impacts on school facilities. [Citation.] Stated generally, the capped school facilities fees became the sole measure for mitigating the impacts of increased enrollment." (*Chawanakee, supra*, 196 Cal.App.4th at p. 1021; see also *Corona-Norco Unified School District v. City of Corona* (1993) 13 Cal.App.4th 1577, 1581–1583 (*Corona*) [affirmed sustaining of demurrer against allegations of CEQA violations and inadequacy of EIR based on entitlement approvals where schools were overcrowded, proposed developments would exacerbate overcrowding, and statutorily authorized fee was insufficient to fund construction of new facilities to alleviate overcrowding].)

---

[12] The two methods are the generation of developer impact fees under Education Code section 17620 and the interim school-facilities provisions in Government Code section 65970 et seq. (Gov. Code, § 65996, subd. (a).)

Sen. Bill 50 then came in 1998 after court decisions had "narrowed the application of the limits on mitigation contained in the [earlier 1986] school facilities legislation and thereby expanded the reach of CEQA." (*Chawanakee, supra*, 196 Cal.App.4th at p. 1022; see, e.g., *Mira Development Corp v. City of San Diego* (1988) 205 Cal.App.3d 1201, 1218 [restrictions in Gov. Code, § 65996 not applicable to legislative actions such as rezoning]; *Murrieta Valley Unified School District v. County of Riverside* (1991) 228 Cal.App.3d 1212, 1234 [county could impose nonfee mitigation measures to ameliorate adverse effects of development on school facilities by reducing density of residential development and imposing controlled phasing in areas of project with inadequate school facilities].) Sen. Bill 50 was the legislative response to these CEQA-expanding judicial decisions. It used " 'three primary means to preempt the field of development fees and mitigation measures related to school facilities and to overturn [this case law]. First, [Sen. Bill 50] provides for a *cap on the amount of fees, charges, dedications or other requirements* which can be levied against new construction to fund construction or reconstruction of school facilities. Second, [Sen. Bill 50] *removes denial authority* from local agencies by prohibiting refusals to approve legislative or adjudicative acts based on a developer's refusal to provide school facilities mitigation exceeding the capped amounts, or based on the inadequacy of school facilities. Third, it limits mitigation measures which can be required, under [CEQA] or otherwise, to payment of the statutorily capped fee amounts and deems payment of these amounts to provide full and complete school facilities mitigation[.]' [Citation.]" (*Chawanakee, supra*, 196 Cal.App.4th at pp. 1023–1024.) Sen. Bill 50 amended Government Code section 65996, among other provisions, to effect these changes. (*Chawanakee, supra,* at p. 1024.)

In *Chawanakee,* as relevant here, the court specifically considered some of the changes in language to Government Code section 65996, subdivision (a) brought by Sen. Bill 50. First, the court concluded that the provision's change in phrase from " 'exclusive methods of mitigating' " to " 'exclusive methods of considering and mitigating' " limits not only the mitigation that may be required for school impacts but also the scope of impact review and the findings for those impacts. (*Chawanakee, supra,* 196 Cal.App.4th at pp. 1026–1027.) Because of Sen. Bill 50, the provision now "obviates the need for an EIR to contain a description and analysis of a development's impacts on school facilities," including "any analysis of the environmental consequences for the existing school facilities that will be forced to accommodate" increased student enrollment resulting from a project. (*Id.* at pp. 1027–1028.)

As for Sen. Bill 50's change from "related to school facilities" to "on school facilities" in Government Code section 65996, subdivision (a) when describing the impacts that might occur as a result of project approval, the court viewed this amendment as a "narrowing of the statute" in its protective effect. The "phrase 'impacts on school facilities' . . . does not cover all possible environmental impacts that have any type of connection or relationship to schools. . . . [T]he prepositional phrase 'on school facilities' limits the type of impacts that are excused from discussion or mitigation to the adverse physical changes to the school grounds and school buildings, and 'any school-related consideration relating to a school district's ability to accommodate enrollment.' (Govt. Code, § 65996, subd. (c).) Therefore, *the project's indirect impacts on parts of the physical environment that are not school facilities are not excused from being considered and mitigated.*" (*Chawanakee, supra,* 196 Cal.App.4th at p. 1028, italics added.)

The *Chawanakee* court concluded that traffic impacts in that case near and related to getting students to and from a school facility is not an impact " '*on* school facilities' " exempt from consideration and mitigation under CEQA for purposes of Government Code section 65996, subdivision (a). (*Chawanakee, supra*, 196 Cal.App.4th at p. 1029, italics added.) The court then held that, notwithstanding a "causal connection between the overcrowding created by the project's students," which itself need not be considered or mitigated, "and the construction to alleviate the overcrowding," the development of additional school facilities at an existing site to accommodate increased enrollment might have "reasonably foreseeable" impacts, such as "dust that degrades air quality and noise caused by the construction activity," on the "non-school physical environment." (*Ibid.*) "These types of impacts to the nonschool physical environment are caused *indirectly* by the project and should be considered in the EIR." (*Ibid.*, citing Guidelines, § 15358, subd. (a)(2) [indirect effects caused by the project].)

Thus, *Chawanakee* held that a project's indirect impacts on parts of the physical environment that are not school facilities are not excused under Government Code section 65996 from being considered and mitigated in an EIR. (*Chawanakee, supra*, 196 Cal.Appl.4th at p. 1028.) It identified impacts in that case—traffic beyond school grounds related to getting students to and from a school facility, and the *reasonably foreseeable* impacts on the non[-]school physical environment of construction at an existing school site to accommodate increased enrollment resulting from a project—as impacts indirectly caused by the project that are not subject to the limitations of Government Code section 65996, subdivision (a). Such impacts therefore must be considered in an EIR. (*Id.* at p. 1029.)

46

As noted, the trial court here was careful in its order and judgment to delineate and provide narrow writ relief only as to "potential off-site environmental impacts resulting from the [Specific Plan] due to [the Districts'] presented concerns that [they] will lack sufficient funding to build the proposed new school sites identified within the [Specific Plan]. The [Final EIR] also failed to adequately respond to comments made by [the Districts] with regard to potential off-site impacts." This followed from the court's comments at the merits hearing that the relief it was granting, under the holding of *Chawanakee*, was "focused on those impacts that are external to school facilities" "when existing facilities may be changed or augmented" as alternative to the construction of new schools as contemplated by the Project to accommodate increased student enrollment. The court's decision thus complied with *Chawanakee* in its distinct treatment under Government Code section 65996 of only indirect environmental impacts on parts of the physical environment that are not school facilities and providing writ relief to only this extent. *Chawanakee* is therefore not dispositive authority for the finding of any error here, because the court's ruling was in line with the distinction in its holding between impacts "on" school facilities and those more broadly "related to" school facilities in the application of Government Code section 65996. But as recognized in *Chawanakee*, and as the trial court here observed, the impacts at issue still must be "reasonably foreseeable" under CEQA to be the basis of a CEQA violation and to be subject to judicially mandated additional consideration, mitigation, and response in the Specific Plan EIR.

47

V.    *The City's Final EIR Complied With CEQA*

    A. <u>The EIR Properly Assumed Schools Within the Project Would be</u>
<u>Built, and Considered and Analyzed Reasonably Foreseeable</u>
<u>Impacts on the Physical Environment From That Assumption</u>

In drafting an EIR, a lead agency is required to assume that all phases of a project will eventually be built. (*Environmental Council of Sacramento v. County of Sacramento* (2020) 45 Cal.App.5th 1020, 1030, 1032 [project description and analysis of impacts for a planned community with a university was sufficient because EIR not required to address speculation that the university might not be built or analyze impacts on that assumption], citing *Vineyard, supra*, 40 Cal.4th at p. 431 [but reference to the entire project being built specific to water supply].) The City here made that assumption, and identified and set aside new school sites within the Specific Plan to accommodate increased enrollment caused by the Project. It also provided project-level mitigation measures for non-school physical impacts from construction of these facilities where possible, including to address air quality, traffic, noise, and other such issues, observing that site-specific environmental review and mitigation by the Districts as lead agencies for each respective school site would come later as plans for these new schools developed. (See also § 21151.8 & Guidelines, § 15186 [special requirements for districts to address health impacts in EIR for school facilities].) And the City imposed developer impact fees under Government Code section 65996 in full and complete mitigation for school impacts. In these ways, the City complied with CEQA, and the Districts do not argue otherwise.

The Districts do complain that the Specific Plan and EIR don't require, provide for, or address phasing of the project build-out over time, instead leaving the pace of proposed development to individual landowners and market

48

conditions. But there is no authority requiring an EIR to phase a decades-long project such as a land-use plan and CEQA does not require analysis of individual phases of projects, instead requiring analysis of the whole, including with less detail when the sequence and pace of construction are largely unknown at the time the EIR is prepared. (*Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 105 (*Sierra Watch*) [lead agency need not speculate about as yet unknown details of project impacts and may discuss potential impacts at a level of specificity determined by the nature of the project and the rule of reason]; see Guidelines, § 15146 [degree of specificity required in EIR].) Further, the Districts did not offer or cite to substantial evidence in the record that build-out of the entire Project over the estimated 20 to 30 years would not occur gradually or would not naturally ramp up over time based on market or other conditions affecting development prospects.

Further, as argued by real parties, the required analysis of a proposed development's impacts on increased demand for public services such as schools is limited. If a proposed development would create an increased demand for public services, as the City acknowledged may happen here with respect to schools, then an EIR must inquire as to whether new or expanded physical facilities may be required to provide such service and address them if so. The impacts that must be addressed under CEQA are the physical effects of providing the increased service, not any possible failure to provide adequate service under applicable standards because of insufficient public funding for which the lead agency is not even responsible. (See *City of Hayward v. Board of Trustees of the California State University* (2015) 242 Cal.App.4th 833, 843 [lead agency not required to address need for additional fire-protection services, which itself is not an environmental impact that CEQA requires a project proponent to mitigate]; Guidelines, § 15382 [an economic or social change by

49

itself is not considered a significant effect on the environment but a social or economic change related to a physical change may be considered in determining whether the physical change is significant]; see also *Goleta, supra*, 37 Cal.App.4th at pp. 1031–1034; *Chawanakee, supra*, 196 Cal.App.4th at pp. 1027–1028.)

The City was thus not required under CEQA to provide for, ensure, or guarantee additional school-funding mechanisms to build the contemplated new schools beyond what the Specific Plan already provided, as the Districts' early comment letters appear to have suggested. Nor was the City required to assume or resolve a failure in the provision of schools as a public service by insufficient funding or otherwise. Nor was it required to view or analyze the Districts' suggested possible scenarios at existing school sites resulting from the assumption of perpetual insufficiencies in school-facilities funding as alternatives to the proposed Project as a whole. Under CEQA, a lead agency must describe a reasonable range of alternatives to the project or the location of a project, and this includes a "no project" alternative and those having the potential to feasibly achieve the project objectives while avoiding or substantially lessening project impacts. (Guidelines, § 15126.6.) The EIR here included discussion of such alternatives. But while alternatives to the proposed *project* must be discussed in an EIR, "that requirement is 'applicable only to the project as a whole, not to the various facets thereof,' " such as new schools within the context of the entire Specific Plan. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 993.)

These principles set some contours for assessing whether the Final EIR here complied with CEQA with respect to the Districts' claimed omissions and inadequacies in the EIR as an informational document.

B. The Information Provided by the Districts Did Not Identify
   Reasonably Foreseeable Impacts and Was Too General,
   Uncertain, and Speculative to Require Further Analysis or
   Response Under CEQA

The extent of the information conveyed and reiterated by totality of the Districts' letters and comments about the inadequacy of the Specific Plan EIR can be summarized as: 1) based on current funding scenarios, sufficient funding over the next two to three decades for construction of the new schools contemplated by the Project was uncertain or unlikely; 2) if this assumption holds true, the Districts may ultimately need to instead accommodate the additional students resulting from the Project through one or more alternative means such as installing portable classrooms at unspecified existing sites, expanding unspecified existing facilities or constructing new facilities at those sites, providing for an undetermined number of inter-district transfers, changing unspecified attendance boundaries, bussing unidentified numbers of students to other districts, and allowing an unidentified number of students to transfer to other districts;[13] and 3) these possible alternative and varied means of accommodating additional students, a responsibility of the Districts, will cause impacts affecting traffic and noise levels, air quality, loss of greenspace or play areas, and other unspecified impacts at unspecified existing school or other district sites, for an undetermined duration of time, whether within or without

---

[13] The Districts contend in their respondents' brief that existing school sites "are well established, as are the areas around them." But this does not elucidate or clarify which of the existing sites would be used or modified in which way to alternatively accommodate increased enrollment for purposes of assessing potential environmental impacts. Nor does this even suggest which existing sites might be used first or might best lend themselves to any of the identified alternatives.

the boundaries of the Specific Plan but unspecified as to which. In assessing this information, we note that with "respect to the production of evidence, a party, here the Districts, that makes assertions based on actions it claims it will take in the future"—such as various alternative measures to building new schools to accommodate increased enrollment—"is in the best position to present evidence that shows its plans for that future action. [Citation.]" (*Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 288 (*Wal-Mart*).)

The most specific of the information provided by the Districts concerned the manner in which school-facilities funding is *currently* generated or sourced and the fact that funding is now insufficient for them to build new schools. The range of one or more possible alternative means by which the Districts might accommodate students at unspecified existing sites or in other districts was given based on the assumption of a perpetual state of insufficient facilities funding for decades into the future. But the information was not provided with any site specificity, preferences or priorities among the alternatives given, the expected tolerances of each option, their timing, or any other details. These options that the Districts might take at some future unidentified point or points were predicted to generally result in several indirect impacts to the physical environment outside existing facilities, whether within or without the Specific Plan boundaries.

Real parties characterize the information provided by the Districts as pure speculation based on uncertainty and vague generalities not requiring further consideration or response by the City under CEQA, other than the conclusion of speculation with an explanation as to why, as the City did provide in the Final EIR in its response to the Districts' public comments. Real parties urge that the trial court erred in concluding otherwise and ordering further

generalized discussion and response by the City based on the Districts' expressed concerns, which discussion could only be less than meaningful, given the type and quality of the information the Districts provided. We conclude that this position has merit.

We have already noted that under CEQA, evidence of environmental impacts must be founded on facts, reasonable assumptions based on facts, and expert opinion supported by facts; it cannot be based on speculation, argument, or unsubstantiated opinion or narrative. (Guidelines, § 15384.) "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." (Guidelines, § 15145.) Subdivision (d) of Guidelines section 15064 provides that "[i]n evaluating the significance of an environmental effect of a project, the lead agency shall consider" both "direct physical changes" and "*reasonably foreseeable* indirect physical changes" in "the environment that may be caused by the project." (Italics added.) Subdivision (d)(3) of Guidelines section 15064 adds that an "indirect physical change is to be considered only if that change is a *reasonably foreseeable* impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable." (Italics added.)

There are many examples in case law of courts finding adequacy of an EIR when information conveyed about omitted impacts or complained inadequate treatment of impacts is of the type and quality that the Districts offered here. The Districts provided long-term projections about insufficient funding premised only on current scenarios, which is not itself an environmental impact. These projections led to a general range of one or more options that might be taken by the Districts sometime in the future to accommodate increased enrollment (also itself not an environmental impact) at

53

one or more existing school sites, either within or beyond the Project area, leading to vaguely described environmental impacts on the non-school environment, whether somewhere inside or outside the Project Site. "When the environmental impact from a particular project feature cannot be reliably ascertained and estimated, it is properly characterized as speculative." (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1250 (*East Oakland*).)

For example, the court in *East Oakland* rejected a challenge to an EIR to the extent it had found the impacts of truck-parking relocation from a project (but outside of it) were speculative, given the difficulty of predicting how current users of a terminal that would be eliminated would respond to their displacement. The EIR found that the lack of specific and reliable information as to where relocation would occur necessarily made any assumptions about relocation speculative. The EIR thus disregarded air quality or emissions impacts beyond the project site, finding that without specific and reliable information on relocation, such analysis would likewise be speculative. (*East Oakland, supra*, 89 Cal.App.5th at pp. 1249–1250.) The project challengers disputed the agency finding of speculation and contended that the EIR should have addressed emissions impacts of parking relocation because "longer distances traveled by relocated truckers might generate greater emissions." (*Id.* at p. 1250.) The trial and appellate courts both rejected the challenge, concluding that the EIR's finding of speculation—because "the extent and character of relocation could not be reliably determined at this time and any attempt to estimate the extent of relocation was, therefore, speculative"— supported by substantial evidence in the administrative record. (*Id.* at p. 1251.)

The *East Oakland* court cited *Rodeo Citizens Assn. v. County of Contra Costa* (2018) 22 Cal.App.5th 214 (*Rodeo Citizens*) in support of its conclusion

about the EIR's finding of speculation and consequent lack of need for further analysis of the air quality or emissions impacts. (*East Oakland, supra*, 89 Cal.App.5th at pp. 1250–1251.) In *Rodeo Citizens*, as explained by the *East Oakland* court, "a refinery sought approval to install equipment that would permit the refinery to capture and sell butane and propane as a byproduct of its operations. ([*Rodeo Citizens*] at pp. 217–218.) The petitioner contended that the EIR prepared in connection with the permit approval was inadequate because it failed 'to quantify the greenhouse gas emissions from the downstream uses of the recovered propane and butane.' (*Id.* at p. 226.) The court held that the agency properly declined to analyze these emissions as speculative. (*Id.* at pp. 226–227.) As the [*Rodeo Citizens*] court explained, it could not be assumed that the propane and butane would be burned because these chemicals have significant nonfuel uses. (*Id.* at p. 227.) Further, because of changing market conditions, ' "historical market data would be an unreliable predictor of the future" ' regarding the manner in which the butane and propane would be used. (*Ibid.*) As a result, the court held, 'the lead agency responsibly determined that further analysis of the potential impacts was impractical and not required.' (*Id.* at p. 228.)" (*East Oakland, supra*, 89 Cal.App.5th at pp. 1250–1251.)

In *Sierra Watch, supra*, 69 Cal.App.5th 86, 105–106, the court of appeal declined to find the EIR inadequate for its failure to estimate the duration of construction noise at a location involving most of the project. "The EIR sufficiently demonstrated why specific detail about the duration of construction noise at each specific location . . . was not possible. The project would be constructed over 25 years. It included no specific plan on where buildings would be located . . . . It included no 'specific construction schedule' because the 'sequence and pace for constructing various land uses and facilities would be market driven.' And it emphasized the potentially sporadic pace of

development, noting that some years may have no construction and other years, in contrast, may involve simultaneous construction of several 'elements' of the project. For these types of reasons, the EIR explained, 'it would not be practical, and would require a great deal of speculation, to identify specific noise levels for every single receptor." (*Id.* at p. 105.)

The *Sierra Watch* court noted that the lead agency there "could have speculated how long construction noise would occur over the next 25 years at each specific location" and "could have presumed where buildings would ultimately be located" and then "assumed that all buildings in any [particular location] would be constructed at the same time—resulting in a shorter period of construction noise. Or perhaps it could have assumed something else altogether. But any estimate . . . would entail a fair bit of speculation. . . . So while [the petitioner] may have preferred detailed estimates about construction duration in each specific location . . . , the EIR was not required to supply speculative estimates. A lead agency, after all, need not speculate about project impacts (see CEQA Guidelines, § 15145) and instead may discuss potential project impacts at a 'level of specificity . . . determined by the nature of the project and the rule of reason [citations]." (*Sierra Watch, supra*, 69 Cal.App.5th at p. 105; see also *Muzzy Ranch, supra*, 41 Cal.4th at p. 388 [level of detail required in EIR in any particular case necessarily depends on multitude of factors, including the nature of the project, the directness or indirectness of the contemplated impact, the ability to forecast the actual effects the project will have on the physical environment, whether future effects will themselves require CEQA analysis, and that the effects will be felt outside the project area; less detail is required where effects are more indirect than effects felt within project area or where it would be difficult to predict them with any accuracy]; *Wal-Mart, supra*, 138 Cal.App.4th at pp. 291–294 [petitioner's assertions about

56

the inevitability of development of a multitenant shopping center at particular location as a result of project approval were vague, uncertain, and contingent and thus amounted to speculation]; *Marin Municipal Water Dist. v. Kg Land Cal. Corp* (1991) 235 Cal.App.3d 1652, 1662–1663 (*Marin*) [when nature of future development is nonspecific and uncertain, EIR need not engage in "sheer speculation" as to future environmental consequences]; *Save the El Dorado Canal v. El Dorado Irrigation District* (2022) 75 Cal.App.5th 239, 263 [possibility that a property owner might deliberately fill a ditch at some point in future rather than maintain their property to minimize flood risk is not a reasonably foreseeable indirect impact of project, which included abandonment of the ditch]; *Citizens' Committee to Complete the Refuge v. City of Newark* (2021) 74 Cal.App.5th 460, 479 (*Newark*) [city did not need to evaluate its potential responses to rising sea levels 50 to 80 years into the future, in part because "the range of projections for sea levels by that time are wide and sea levels at different ends of those projections could warrant significantly different responses"]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 77, fn. 5 ["an impact statement prepared before reliable information is available would 'tend toward uninformative generalities' "].)

In the City's responses to the Districts' comments contained in the Final EIR, the City included the comment letters and responded to each. The City noted that impacts associated with schools were analyzed in the EIR with Public Services, among other general topics of impacts, and that the City's policies were to work with local districts to identify and set aside new school sites and consider impacts to ensure public services and maintain public-facilities standards. The City identified the five new school sites within the Project, and noted that the Education Code tasks the Districts with the responsibility for constructing their own schools. The City also noted that the

Specific Plan imposed developer impact fees to fund new school development in full mitigation under Government Code section 65996, set according to law by the Districts, and that the City would aid in collecting those fees. The City expressed its belief that it had sufficiently addressed, "at least in general terms," the physical impacts of constructing new schools within the Specific Plan area, and that the "footprint-related impacts of the schools are subsumed within the analysis of the footprint of the entire Specific Plan," including mitigation.

The City also noted its perception of legal limitations on analyzing impacts from new or expanded facilities involving the provision of public services and that the social and economic effects of a project—like increased enrollment—are not themselves treated as significant effects on the environment. The City further noted that with the construction of new schools, there would be site-specific environmental review conducted by the responsible school district for impacts not yet known, as the City did not have specific designs from the Districts for the three as yet undesigned new schools. Thus, the EIR "does not speculate beyond the material facts that are available for each site" at the time the Specific Plan was being considered.

The City also noted the holding of *Chawanakee*, and that it "obviated the need to analyze and mitigate a development's direct impacts *on* existing school facilities." (Italics added.) The City acknowledged the Districts' concerns about accommodating increased student enrollment and raised the estimate of new students from the Specific Plan based on information on current enrollment provided by the Districts. The City further observed that the Specific Plan and EIR maximized the developer fees that could be collected for schools and that the City could not legally impose greater fees for new-school facilities, with the Districts as lead agencies responsible for construction of their own new schools.

58

As to the District's proffered range of alternative options for accommodating new students at existing sites—by using portables, expanding or modifying existing sites, adjusting attendance boundaries, and allowing inter-district transfers—with the vaguely identified and non-site-specific impacts on "noise-levels, air quality, loss of greenspace or other play areas" (italics omitted), the City specifically responded that the "potential scenarios" offered by the Districts "are too speculative to give rise to meaningful environmental assessment." In support of this conclusion, the City noted that if the cited scenarios were to occur, that would only happen over 20 to 30 years as number of students living in the site gradually increased. The Districts would have the ability over that time "to make decisions as to where such students should attend schools, if no on-site facilities are yet in place. The specific decisions the District will have to make cannot be predicted with any level of certainty at present, and, in any event, are beyond the City's control. In particular, the City has no way at present to try to predict boundary changes the District might impose in future years. Although such decisions could affect traffic and other environmental resources, any details of such impacts cannot be predicted at present. The same is true of options such as student transfers, the construction of other, currently unplanned schools at other sites, or changes in current patterns of school bussing. To the extent that the District contemplates the installation of portable classrooms at existing school facilities, the City notes that CEQA provides a categorical exemption (Class 14) for 'minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, whichever is less.' "

The City's determination of the Districts' proffered information as speculation not capable of leading to meaningful analysis or requiring further

response in the EIR is a factual conclusion entitled to deference. (*Anderson, supra,* 130 Cal.App.4th at p. 1186 [substantial evidence supported agency's factual conclusion that asserted environmental impact of urban decay was speculative and not reasonably foreseeable]; *County of Butte v. Department of Water Resources* (2023) 90 Cal.App.5th 147, 164 (*Butte*); see *id.* at p. 161, [treating lead agency's "finding of uncertainty" about impacts of climate change as factually supported in the record]; *Tiburon, supra,* 78 Cal.App.5th at p. 728 [legal error in failing to comply with CEQA is reviewed independently but all factual determinations are reviewed for substantial evidence, including the methodology used for studying an impact, the scope of an EIR's analysis of a topic, and the reliability or accuracy of the data upon which EIR relied]; *Ebbetts Pass Forest Watch v. California Department of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 955 [determination of future uncertainties and unpredictability as leading to less detailed and specific analysis was predominantly factual question].)

Beyond that, we conclude that based on the non-specific, uncertain, and vague nature and quality of the information provided by the Districts, in the context of a land-use and long-range planning document like the Specific Plan, the Final EIR for the Specific Plan and the City's responses to the Districts' comments were adequate under CEQA. This is especially true when the generally identified potential indirect and off-site impacts related to existing school facilities were impacts that might flow and could be identified only from later decisions by the Districts themselves, which impacts may call for later project-level environmental review by the Districts, not the City. The City was not required to "dimly guess" about potential impacts based on uncertain and non-specific information and many unknowns. (*Newark, supra,* 74 Cal.App.5th at p. 479.) To the extent the City reached the conclusion that the Districts'

60

comments were speculative, noted the conclusion, and terminated the discussion, the City complied with Guidelines section 15145 concerning speculation and section 15088 on responses to comments. (See, Guidelines, § 15088, subds. (a) & (c) [lead agency must respond to comments on "significant environmental issues" in good faith, giving detailed reasons why specific comments and suggestions were not accepted but level of detail may correspond with level of detail provided in comment; responses to general comments may be general].) Given the non-specificity of the comments and the extent to which information about decisions the Districts might make in the future to accommodate additional students if new schools were not built, and any related environmental impacts resulting from those future decisions, was not yet known, additional discussion, analysis, or response by the City could not possibly be meaningful in the sense CEQA intends and requires to serve its informational and decision-making purposes.

On this record, and based on our independent review while deferring to the City's factual determination of speculation in the Districts' comments, "we are satisfied that the EIR ' "include[d] detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the [Specific Plan]" ' [Citation.] That was enough." (*Butte, supra*, 90 Cal.App.5th at p. 164; *Sierra Club, supra*, 6 Cal.5th at pp. 520–521; *Laurel Heights, supra*, 47 Cal.3d at p. 405.) As an informational document, the Final EIR was required to study and analyze only the reasonably foreseeable consequences of the Specific Plan. (See *High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 125–126.) It was not required to engage in " 'sheer speculation' " based on non-specific and uncertain information about events or development that might occur in the future. (*Marin, supra*, 235 Cal.App.3d at p. 1662.) Further, the Districts' comments and the City's

61

responses reflect the Districts' concerns and disagreement with the adequacy of the EIR as it concerns school funding and facilities. This content serves CEQA's informational function to apprise the public of these issues and to enable those who did not participate in the EIR's preparation to consider the issues to the extent currently possible, given the present unknowns. (See e.g. *Banning Ranch, supra,* 2 Cal.5th at p. 940; *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 516–517 [discussion in section for responses to comments in EIR may satisfy informational purposes of the document under CEQA]; *City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 550, 553 [responses to comments are part of EIR itself and their sufficiency must be viewed in light of reasonable feasibility].) The record reflects that the City used its best efforts to ascertain and disclose all that it reasonably, feasibly, and currently could under the circumstances, addressing identified reasonably foreseeable impacts as required and avoiding what could only be speculative analysis or uninformed generalities based on the type and quality of the information the Districts provided. Finally, the Districts' "general comments [could] be met with general responses," which here are adequate. (*Save the El Dorado Canal v. El Dorado Irrigation Dist., supra*, 75 Cal.App.5th at p. 268.)

Having concluded that the City's Final EIR complied with CEQA, we reverse the judgment determining otherwise.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to (1) vacate its order granting the Districts' mandate petition as to the first and fifth causes of action; (2) enter a new order and judgment denying the petition in full; and (3) recall the writ of mandate. Appellants are entitled to their costs on appeal by operation of California Rules of Court, rule 8.278(a)(1) and (2).

_____
WILLIAMS, J.*

WE CONCUR:



_____
DANNER, ACTING P.J.



_____
WILSON, J.



*Santa Rita Union School District, et al., v. City of Salinas, et al.*
H049854

---

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| Trial Court: | Monterey County Superior Court |
| | Superior Court No.: 20CV000242 |

| Trial Judge: | The Honorable Marla O. Anderson |

| Attorneys for Plaintiffs and Respondents Santa Rita Union School District et al. | Lozano Smith |
| | Sloan R. Simmons |
| | Michael R. Linden |
| | Junaid Halani |

| Attorneys for Real Parties in Interest and Appellants Rexford Title, Inc., et al. | Pioneer Law Group, LLP |
| | Andrea A. Matarazzo |
| | Kathryn L. Patterson |
| | Teresa L. Zuber |

*Santa Rita Union School District, et al., v. City of Salinas, et al.*
H049854